The City of Shreveport owned an obsolete standpipe or water tank near the Charity Hospital therein, which had not been used for six or eight years. It was regarded as a hazard to the surroundings, and, for this reason, the council decided to have it dismantled and removed. Effort was made in this direction for a year or more without success because it required a person of experience in such matters, equipped with appropriate implements, to safely effectuate the demolition. Finally, J.A. Noble, learning of the city's desire to have the standpipe razed, contacted Honorable J.S. Reily, Commissioner of Public Utilities, to whose department such an undertaking properly fell. After some discussion on the subject, an agreement was reached between them which was reduced to a letter contract of which the following is a copy:
"Mr. J.A. Noble 1209 Western Avenue Shreveport, Louisiana
Dear Mr. Noble:
This letter will confirm the agreement which we have had concerning the sale to you by the City, of the standpipe located in the rear of the Meter Building on Texas Avenue.
The City agrees to sell you this property for the following considerations:
You are to pay the City two-hundred fifty dollars ($250.00); you are to reclaim the material, sell same and deduct your expenses — the balance to be divided equally between yourself and the City.
You understand that you agree to raze, demolish, dismantle and remove from its location the standpipe down to the foundation. You obligate yourself to exercise every care in this demolition. It is essential that all undue noises be eliminated so as not to interfere with the patients in the hospital nearby.
It is further understood that you will arrange your work so as not to interfere with the operations of our Meter Department.
It is further understood that the City is in no way responsible for any labor, insurance, or in anywise connected with any operations involved in this work.
It is further understood and agreed that you are to remit to the City, the amount of $250.00 of the first sales of the materials, and that you are to furnish the City complete accounts of all transactions involved in this sale, so that the final deductions may be made.
Yours truly, (Signed) J.S. Reily Commissioner of Public Utilities.
If the above outlines your understanding of our agreement, please indicate by affixing your signature below. (Signed) J.A. Noble".
Noble promptly entered upon the task of demolishing the tank. He hired his own helpers, fixed their wages, hours of work, and paid them himself, among whom was plaintiff herein, Joseph Leonard Brown. He worked on the job for about ten days and was seriously injured when the scaffold on which he was working, on account of excessive weight of disconnected parts of the tank thereon, gave way and precipitated him to the bottom of the tank, a distance of forty-five or fifty feet. His disability is conceded to be permanently total. He instituted this suit against Noble, the City of Shreveport, the carrier of its compensation insurance, and against the Departments of Public Utilities and Water and Sewerage, to recover compensation at the rate of $20 per week for 400 weeks; also $250 to cover hospital, physician's and medical expenses.
The suit as against the city and its two departments is predicated upon the theory that the contract for the dismantling and removal of the standpipe, above quoted, is a mere sham; not a sale at all, and its execution simply an attempt to circumvent the Employers' Liability Act in the event of injury of workmen on the job; that Noble was in fact and in law an employee or an independent contractor of the city. In the alternative, it is alleged: "In the alternative, your petitioner shows, that if the said J.A. Noble was not an employee or subcontractor, then under the agreement he and the City were partners and are liable in solido to your petitioner for the amounts stated above."
It is further alleged that as the city owns and operates systems of water supply and sewerage, necessitating the laying of pipes, mains, etc., and the erection and maintaining of water tanks, etc., to provide adequate supply of water to its citizens and business *Page 236 
and industrial establishments, the demolition and removal of the standpipe fell within its "trade, business or occupation" within the meaning and intendment of the Employers' Liability Act.
Defendant, Noble, excepted to the petition as disclosing neither a cause nor a right of action as to him. The exceptions, by consent, were referred to the merits. Answering, he denies liability to plaintiff on any account and sets up special defenses. However, as he did not appeal from the judgment against him, the case, as to him, is closed and the judgment final so far as concerns the present appeal. Therefore, we omit analysis of his answer beyond what has just been said.
The other defendants affirm the letter contract as being what its own language declares it to be, towit: a sale of the standpipe to Noble on the terms, for the price, and on the conditions therein expressed; and, therefore, aver that the relation of the city and Noble was that of seller and purchaser; not employer and employee nor principal and independent contractor.
Defendants further aver that the city is not engaged in the business of dismantling and removing standpipes and because of this its action in having the standpipe demolished and removed, even though it should be held that it was not sold to Noble, was not a part of its "trade, business or occupation", nor of said two departments.
The demand against all defendants save Noble was rejected and plaintiff's suit as to them dismissed at his cost. As aforesaid, there was judgment in his favor and against Noble awarding him compensation in the amount and for the period for which prayed, together with $250 hospital, physician and medical fees. Plaintiff appealed from the judgment in so far as it rejected his demand.
The lower court gave written reasons for judgment. The contract between Commissioner Reily and Noble was held to be a sale according to its own terms and conditions. We have reached the same conclusion and, this being true, other defenses interposed by defendants, appellees, need not be considered.
A contract of sale is defined by Article 2439 of the Civil Code as follows:
"* * * an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself.
"Three circumstances concur to the perfection of the contract, to-wit: the thing sold, the price and the consent."
"The price of the sale must be certain, that is to say, fixed and determined by the parties." Civil Code, Article 2464.
Let us now examine to see if the contract under consideration meets these various requirements. We have the res, which is the standpipe; the consent, which is clearly reflected from the written instrument, and a certain price. True it is that beyond the initial payment of $250 the price was not definitely fixed or determined in the agreement but such balance was easily susceptible of being absolutely determined. That which may be made certain in such a contract in legal contemplation is certain. The balance of price coming to the city, as contemplated by the parties and declared in the agreement, was to be one-half of the proceeds of sale of the scrap metal after deducting expenses of dismantling and removing. Should there be no profit the city, of course, would receive only $250 for its property.
In the following cases the contention in each that the price was not certain had more substantial support than in the present one, yet in each case the court overruled such contention, to-wit: Lee Lumber Co., Ltd., v. Hotard et al., 122 La. 850, 48 So. 286, 129 Am.St.Rep. 368; Gallaspy v. A.J. Ingersoll Co.,147 La. 102, 84 So. 510; Union Tank Car Co. v. Louisiana Oil Refining Corporation, 178 La. 940, 152 So. 571.
It is argued that because of the various incidental stipulations incorporated in the agreement its efficacy as a sale was destroyed, and in its place there flowed an agreement through which Noble became an employee of the city or an independent contractor. We are sure this contention is not well founded. The pertinent facts and antecedent history of the transaction refute it. It is true that Mr. Reily in negotiating with prospective contractors and/or purchasers kept in mind his duty to protect the city against such claims as are now urged against it; and he believed he had done so when he closed the contract with Noble. But this course and his action do not at all warrant the inference that the Employers' Liability Law was being circumvented in bad faith or for sinister purposes. He desired to see the standpipe cut down and removed under such safeguards that no claims *Page 237 
of any sort could therefrom be made against the city. For this reason he was unwilling to contract the job to any one or sell the tank to one he deemed to be irresponsible. He knew that Noble was competent to successfully demolish the tank and that he possessed adequate tools and implements to perform the work. However, as Reily doubtless learned, Noble had limited cash on hand. This handicap was not sufficient to prevent an agreement between them; hence, the cash payment of $250 in advance was not required.
Noble was interested in dismantling and removing the tank purely as a business proposition. He felt certain that he could make a profit therefrom. He wished to see the job carry itself in a financial way and for this reason agreed to pay the city the $250 from first sales of junk. He estimated that the scrap metal would amount to eighty tons and would sell for not less than $12 per ton, but results were disappointing. The tank was one-half a century old. The lower portion had crystallized while corrosion was so extensive throughout that the salable metal amounted to only between fifty and sixty tons and sold for $10 per ton delivered to the purchaser in the City of Shreveport. The total receipts of sale were therefore between $500 and $600. Practically nothing remained after paying for labor and price of materials used in the work. The $250 due the city was not paid as per agreement. When the standpipe had been entirely removed the best Noble was able to do for the city was give it his note for the $250 due at a future date. He did this in recognition of his obligation under the contract which he believed to be a sale. He equivocated to some extent in his testimony, but we think the following excerpt therefrom reflects his honest conviction on the subject, viz.:
"Q. In other words, Mr. Noble, you thought that the thing would realize One Thousand ($1,000.00) Dollars? A. That is the way I figured it, yes, sir.
"Q. You were, therefore, willing to buy the tank from the City of Shreveport and guarantee that you would pay them Two Hundred Fifty ($250.00) Dollars plus one-half of any profits you made above your expenses? A. That is right.
"Q. All right, sir. And that is what you did, except you misfigured on the value of the junk steel that was there? A. That is right exactly."
It is argued that because the contract stipulated that Noble should dispose of the scrap metal and pay the city $250 from first sales, the city's control in this way demonstrates that the contract, as a sale, was lacking in one important element, — absence of perfect control and dominion of the res by the purchaser. The facts negative this contention. Noble took possession of the tank and had the right to sell the metal to whom and for such price as he was willing to accept. The city was not consulted on these points and had no right to direct Noble's actions in regard thereto. Had he elected to pay the $250 from other funds the city could not have objected and doubtless would not have done so. It did desire and require that the scrap metal be promptly removed from the lot on which the standpipe stood, the ownership of which is vested in the city, and not be allowed to accumulate in large quantities for long periods.
The city exercised no supervision whatever over the work of demolition nor did it attempt to do so. It was solicitous of the peace and quiet of the patients of the hospital near by and for that reason the clause requiring noise incident to dismantling be kept at a minimum, was inserted.
So far as our knowledge goes, when the relation of principal and independent contractor exists there accrues to the latter a right to demand and receive money or something else of value from the former. We cannot conceive of a case where the converse would be true and that relation still subsist.
There is no merit in the alternative position of plaintiff. The written contract and the construction placed thereon by the parties clearly reflect that they did not intend that a partnership relation should result therefrom; certainly, such relation cannot be implied in view of the language of the contract and pertinent facts disclosed by the record.
The judgment appealed from being manifestly correct, it is hereby affirmed with costs.
HARDY, J., recused. *Page 238