225 So.2d 362

George J. ARATA

v.

The LOUISIANA STADIUM AND EXPOSITION DISTRICT, and the Board of Commissioners thereof, Honorable John J. McKeithen, Governor of Louisiana, Honorable Bernard F. Sliger, Commissioner of Administration, Mrs. Mary Evelyn Parker, Treasurer of the State of Louisiana, and the Louisiana State Bond Commission.

No. 49803.

June 27, 1969.

Dissenting Opinion June 30, 1969.

Rehearing Denied July 21, 1969.

Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, Glen G. Magnuson, Jr., Harry B. Kelleher, Gerald P. Fedoroff, Foley, Judell, Beck, Morel & Bewley, Harold B. Judell, John E. Jackson, Jr., New Orleans, Wood, King, Dawson, Love & Sabatine, New York City, for appellants.

Sidney M. Bach, New Orleans, Alvin J. Liska, City Atty., Beuker F. Amann, Jackson P. McNeely, Asst. City Attys., for amicus curiae.

Blake G. Arata, Doyle, Smith, Doyle, Gordon, Arata & Watters, New Orleans, for plaintiff-appellee.

Paul O. H. Pigman, Phillip A. Wittmann, David Stone, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, J. Bennett Johnston, Jr., James J. Thornton, Jr., Johnston, Johnston & Thornton, Shreveport, for intervenors-appellees.

SUMMERS, Justice.

The question presented by this suit is whether the transactions executed to effectuate the planning, financing, construction, development, maintenance and operation of a domed stadium project are contrary to the constitutional amendment adopted in 1966 authorizing the project.

By Act 556 of 1966 the Legislature adopted by more than a two-thirds vote,

a joint resolution proposing the constitutional amendment in question. The amendment was voted on throughout the State on November 8, 1966, and carried by an overwhelming vote. It became Section 47 of Article XIV of the Constitution.

The amendment created the Louisiana Stadium and Exposition District, as a body politic and political subdivision of the State, composed of all of the territory in the parishes of Orleans and Jefferson, to be governed by an appointed, eleven-man Board of Commissioners.

The amendment declares that the District is created to plan, finance, construct, develop, maintain and operate facilities in the District to accommodate the holding of sports events, athletic contests and other events of public interest. As an instrumentality of the State, exercising essential governmental functions for the benefit of the people and to increase their commerce and prosperity, the District is granted broad tax exemptions. Control and supervision of the District by regulating bodies or other subdivisions of the State is denied, except the District is made subject to State requirements of audits, listing employees, investing idle funds and the Code of Ethics.

Broad authority is conferred in the amendment for the District to plan, construct and maintain a complex suitable for all types of sports and recreation and to enter into contracts for events and programs with the State and public or private agencies or persons; "to execute leases to the State," its agencies or subdivisions for a term not exceeding forty (40) years at a "fixed rental"; to borrow such sums as the Board determines to be necessary for the construction and improvement of the project; to incur debt and issue bonds in evidence of its indebtedness and agree that the loans shall be liquidated from rentals derived by the District for use of the facilities leased; to collect admissions, tolls, rentals and other charges or fees; to levy and collect hotel occupancy taxes, and pledge the proceeds thereof to the payment of bonds it issues; to mortgage the District's property and "pledge any lease or leases and the rents, income and other advantages arising out of any lease or leases."

Paragraph (E) of the amendment provides:

Any other provisions of the Constitution and laws of the State to the contrary notwithstanding and without compliance with any other constitutional or statutory provisions relative to leasing of public facilities the State of Louisiana or any of its various agencies, or any political subdivision thereof, or any combination of the foregoing *shall have the right and authority to lease the* aforesaid *facilities of the District* or any portion thereof *and provide for the payment of the consideration therefor through the*

*appropriation of funds* or otherwise. *The obligations of the lessee or lessees under any such lease shall constitute a charge against the revenues of such lessee or lessees* to the extent and in the manner agreed upon by the parties thereto. In the event the State of Louisiana or any of its various agencies or any political subdivision thereof or any combination of the foregoing shall lease all or any portion of the aforesaid facilities of the District, then such entities shall have the right to sublease to any person or corporation, public or private, all or any portion of the facilities so leased upon such terms and conditions as they may determine. (Emphasis added.)

Paragraph (G) authorizes the District to enter into agreements with its bondholders as to the management of the facilities, the lease or rental thereof, and such other matters deemed proper to assure the marketability of the bonds. Paragraph (Q) authorizes the District to receive by gift, grant, donation or otherwise any sum of money, aid or assistance from private sources, the United States, the State of Louisiana, or others, and to pledge same to secure its bonds. Paragraph (S) stipulates that "No bond issued under this amendment shall be secured by the faith and credit of the State."

The amendment further sets forth that it is self-sufficient and self-executing.

Soon after its organization in June 1967, the District enacted the hotel occupancy tax contemplated by the amendment, and the levy has been in effect since August 1967. With funds derived from this source the District proceeded to accumulate the data, information, plans and studies which would form the basis for construction contract estimates and other costs involved in the execution of the plan.

When the required data were accumulated, acting upon the advice of financial experts, the District proceeded with the execution of the contracts required to implement the plan to build the stadium project in the Metropolitan New Orleans area. Each transaction formed an integral part of the total plan. All were dated February 1, 1969 for reference purposes. They included adoption of a resolution by the District authorizing the issuance of bonds, the execution of a contract whereby the District leased the facilities to be acquired in accordance with the plan to the State; and the State, in turn, entered into a management and operating agreement with the District involving the facilities the State had leased.

Suit was filed in Orleans Parish on February 21, 1969 by George J. Arata seeking an injunction to prevent the District from carrying out the provisions of the lease and the management and operating agreement, from issuing and selling any of the bonds in accordance with the bond

resolution, and from expending any sums in the execution of the lease. Interventions were also filed seeking substantially the same relief.

After trial the judge declared the lease, the management and operating agreement and the bond resolution to be illegal and unconstitutional and, accordingly, granted an injunction prohibiting the District and the officers acting on behalf of the State, and all others, from carrying out the provisions of the lease, the management and operating agreement or the bond resolution. The judgment upheld the validity of Act 556 of 1966 but did not pass upon the validity of the hotel occupancy tax. This appeal followed.

Five principal grounds are advanced for the invalidity of the transactions in question.

I.

It is contended that the lease is not the type lease which is authorized by Section 47 of Article XIV of the Constitution because of the provisions of the lease agreement requiring the State as lessee to pay the costs of operation, maintenance and repairs to the facilities leased, plus taxes, assessments and income taxes derived from the operation of the facilities, debt service and management expense. Lessee's unconditional obligation to pay the rentals and the credit allowed the lessee based upon the revenues derived from the hotel occupancy tax to-

gether with the non-terminable clause are also advanced as stipulations which render the lease invalid.

■ These arguments fail to take into consideration that the amendment places no limitations upon the terms and conditions of the lease which it authorizes except the duration of the lease and the requirement of a fixed rental. Under the terms of paragraph (D) the District is authorized "to execute leases to the State * * * for a *term* not exceeding forty (40) years at a *fixed rental,* or for a term not exceeding ninety-nine years * * *" (Emphasis added.) The requisite authority to enter into a lease is, therefore, explicit in paragraph (D). It is even more explicit and emphatic elsewhere in the amendment. Paragraph (E) expands upon and amplifies the authorization. By this latter provision the State may enter into the lease "without compliance with any other constitutional or statutory provisions relative to leasing of public facilities * * *" Thereby the formalities ordinarily prescribed for public leasing are dispensed with. Paragraph (E) again sets forth that the State "shall have the right and authority to lease the * * * facilities of the District."

*"Fixed Rental"*

As part of the argument to support the contention that the lease is invalid, it is asserted that the lease does not provide for a

"fixed rental". Article 2669 of the Civil Code defines a lease to be "a synallagmatic contract, to which consent alone is sufficient, and by which one party gives to the other the enjoyment of a thing, or his labor, at a *fixed price*." (Emphasis added.) And "The price should be certain * * *" La.Civil Code art. 2671. The requirement of a "fixed rental" in the amendment is nothing more than the reiteration of the codal requirement of a "fixed" or "certain price". We will, therefore, determine "fixed rental", as used in the amendment, by the same principles which serve to define "fixed price" under the codal article.

The rent is always sufficiently certain "if it can be readily ascertained", Logan v. State Gravel Co., 158 La. 105, 103 So. 526 (1925); if it can be "fixed in money, commodities or labor" not dependent upon the mere whim of the landlord, Roussel v. Dalche, 158 La. 742, 104 So. 637 (1925) or if the rental payment is easily calculable, Succession of Pietri, La.App.Orl. No. 7991 (1921). See also Gordy v. Maestri, 170 La. 281, 127 So. 628 (1930) where the gross revenues to be derived from animal trapping on the leased premises met the requirements of a fixed price; Hardy v. Lemons, 36 La.Ann. 107 (1884), where the lease of a racehorse for one-half of the net profits derived from the horse's winnings was upheld; Duckworth v. Harrison, Gunby's Dec. 58 (La.App.1885) holding that farmland may be leased for a percentage

of the crop produced. Compare La.Civil Code art. 2668; J. P. Hudson & Sons Co. v. Godchaux Co., 166 La. 912, 118 So. 81 (1928); Le Blanc v. Godchaux Co., 152 La. 405, 93 So. 201 (1922); General Finance Corp. of New Orleans v. Harrell, 188 So.2d 211 (La.App.1966); Brown v. City of Shreveport, 15 So.2d 234 (La.App.1943).

■ According to the lease the State must pay, beginning with the commencement of the lease term, "base rentals" annually in the amount required to pay principal and interest on the bonds, plus trustees' and paying agency fees, expenses and bank service charges. The base rentals are reduced by the amount realized from the hotel occupancy tax each year, the proceeds of which are pledged to the bondholders. Additional rentals are payable by the State in an amount sufficient to meet any deficiency in the bond payments and to cover expenses incurred in the event of the State's default under the lease or termination of the management and operating agreement. Since all revenues derived from the operation of the facilities go to the State, the expense of operation under the management agreement must be paid by the State to the District. Rentals are further reduced by the net income from the operation of the project. The rental is, in the final analysis, the total amount the State must pay to satisfy the claims of the bondholders, less the sum of the hotel occupancy tax plus the net amount realized

from operation of the facilities. It is an amount which is readily determinable by calculation and the requirement of a "fixed" rental is satisfied.

### *'Thing"*

■ Although a detailed description of the property proposed to be acquired is attached to the lease as an appendix, it is contended that the "thing" leased, as contemplated by Articles 2669, 2670, 2692 and 2728 of the Civil Code is not definitive, because lessor is authorized to substitute other property if the described property cannot be acquired or to modify the description if errors in the description are later discovered. There is no merit to this contention because the land contemplated by the lease is either that described or the site later chosen for the project if a modification should become necessary and if it should be mutually agreed upon. Under the specific terms of the lease the State is given absolute control (veto power) over the project, in that it must approve the master plan, the plans and specifications for the project, and the award of the prime construction contract before it incurs any rental obligation. There can be no approval of the project without the State's approval of the site or its agreement to modify the site description. Reduced to its bare essentials, the provision is nothing more than the reservation of the right to modify the contract by mutual consent of the parties—a right which is implied in every agreement unless there is a stipulation to the contrary.

Other than the argument that the lease does not satisfy the "fixed" rental requirement, and that reference to the "thing" is indefinite, Arata has not pointed out wherein the lease fails to fulfill the requirements of the general law concerning leases. It may be that the lease in question is complex and unique, but it is not any less valid for that reason. The unusual nature of the stadium project admittedly made this special constitutional authorization necessary. The amendment is so designed that the legality of the plan is to be ascertained almost entirely within its four corners.

### II.

As an alternative contention, it is urged that if the lease is the type authorized by the amendment, the Governor and Commissioner of Administration who executed the lease for the State have no power or authority to do so in the absence of ancillary legislative authorization. The answer to this contention is found in the amendment:

> Any other provisions of the Constitution and laws of the State to the contrary notwithstanding and without compliance with any other constitutional or statutory provisions relative to leasing of public facilities the State of Louisiana or any of its various agencies, or any politi-

cal subdivision thereof, or any combination of the foregoing shall have the right and authority to lease the aforesaid facilities of the District. La.Const. art. 14 § 47(E).

\*   \*   \*   \*   \*   \*

This amendment is to be regarded as self-sufficient and self-executing without any supplementary action on the part of the Legislature or any other State authority. La.Const. art. 14 § 47(T).

▮ The unambiguous language of the Constitution makes it clear that no legislative authority was needed for the leasing of the project. Moreover, under existing authority (La.Const. art. 5 § 14), the Governor is charged with the responsibility to "take care that the laws be faithfully executed," while the Commissioner of Administration is authorized by statute (La. R.S. 39:4) to perform the State's administrative functions in leasing buildings, structures and space. Together, the State's Chief Executive and Commissioner of Administration were the proper parties authorized to execute the lease on behalf of the State.

### III.

▮ As a corollary to the previous argument, it is asserted that the lease constitutes the incurring of a debt by the State without the affirmative vote of two-thirds of the elected members of each House of the Legislature as required by Article IV, Section 2, of the State's Constitution.[1]

1. La.Const. art. 4, § 2 provides: "Except as otherwise provided herein, the Legislature shall have no power to contract directly or through any State Board or State Agency the incurring of debt or the issuance of bonds involving the dedication of all or any part of the tax revenues imposed and collected by the state except upon the two-thirds vote of the elected membership of each of the Houses and then only if the funds are to be used to make capital improvements, repel invasion or suppress insurrection. If the purpose is to make capital improvements, the nature, approximate location and, if more than one project, the amount allocated to each and the order or priority shall be stated in the Act or in a capital budget otherwise adopted according to law. The full faith and credit of the State shall be pledged to the repayment of such bonds or other evidence of indebtedness. Public referendum shall not be required. This prohibition shall not apply to cities, towns and villages, parishes, school boards or any other local political subdivisions of any kind; nor shall it apply to any state board, authority, commission or other state agency empowered by other Constitutional authorization or to any law adopted by the Legislature within the scope of any such other Constitutional authorization; nor shall it apply to any state board, authority, commission or other state agency created by an Act of the Legislature with respect to any proposed debt to be incurred thereunder and any proposed bonds to be issued in connection therewith where secured solely from the revenues of the project.

   "Nor shall the Legislature alienate, or authorize the alienation of, the fee of the bed of any navigable stream, lake or other body of water, except for purposes of reclamation. In all cases the mineral rights on any and all property sold by the States shall be reserved, except where the owner or other person having the

This argument is insupportable, for it fails to take into consideration that the lease in question was not executed upon legislative authority, but, to the contrary, is explicitly authorized by the Constitution—the paramount law itself, which declares in Paragraph (E) that the State has the right and authority to enter into the lease, *"Any other provisions of the Constitution and laws of the State to the contrary notwithstanding and without compliance with any other constitutional or statutory provisions * * *."* Necessary authorization for paying the rentals is also set out in the amendment. La.Const. art. 14 § 47(E). (Emphasis added.)

Prohibitions and limitations contained in Article IV, Section 2, of the Constitution cannot, therefore, inhibit the broad and unequivocal grant contained in Article XIV, Section 47, which, as we have already noted, stands insulated from other constitutional and statutory enactments which may be construed as modifying its provisions. E. g., see Kliebert v. South Louisiana Port Commission, 182 So.2d 814 (La.App.1966) cert. denied 248 La. 1030, 183 So.2d 652 (1966). It is only necessary to resort to other laws when it is necessary to define, explain or clarify the meaning of the words and terms used in Article XIV, Section 47. When other constitutional provisions are in direct opposition to the clear terms of Article XIV, Section 47, the latter is unaffected by them.

IV.

Another argument advanced is that execution of the lease by the State constitutes the pledging of the funds, credit, property or things of value of the State to the District contrary to Article IV, Section 12, of the Constitution. Reliance is placed upon the following quoted language of Article IV, Section 12, to support this proposition:

The funds, credit, property or things of value of the State, or of any political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, associations or corporations, public or private; nor shall the State, nor any political corporation, purchase or subscribe to the capital stock or stock of any corporation or association whatever, or for any private enterprise. Nor shall the State, nor any political corporation thereof, assume the liabilities of any political, municipal, parochial, private or other corporation or association whatsoever, except as otherwise provided in this Constitution; nor shall the State undertake to carry on the business of any such corporation or association, or become a part owner therein; * * *.

right to redeem may buy or redeem property sold or adjudicated to the State for taxes. This, however, shall not prevent

the leasing of such lands and rights for mineral or other purposes."

Aside from our firm conviction that the State is not engaged in any of the actions prohibited by Article IV, Section 12, but instead is entering into a valid lease contract for which it receives valuable property rights, we do not believe that Article IV, Section 12, can be invoked to limit the grant contained in Article XIV, Section 47. As we observed in connection with a like contention made with respect to Article IV, Section 2, in Subhead III above, if Article IV, Section 12, is contrary to the clear terms of Article XIV, Section 47, the latter prevails.

## V.

The main thrust of Arata's attack, and that of the intervenors, has been centered upon the argument that adoption of the bond resolution and execution of the lease and management agreement have obligated the faith and credit of the State as security for the bonds to be issued by the District contrary to paragraph (S) of Section 47 of Article XIV of the Constitution, which provides that "No bond issued under this amendment shall be secured by the faith and credit of the State".

If the transactions are viewed superficially and in a technical sense, the bonds are not secured by the faith and credit of the State for several reasons. To begin with, the State is not the issuing authority—the District is the issuer of the bonds. As a separate corporate body and political subdivision of the State, the District is without any authority to bind or obligate the State in any manner. Hence the bonds and debts of the District are not the liabilities of the State. State ex rel. Porterie v. Charity Hospital of Louisiana at New Orleans, 182 La. 268, 161 So. 606 (1935); Caldwell Brothers v. Board of Supervisors of Louisiana State University et al., 176 La. 825, 147 So. 5 (1933); Board of Commissioners of Tensas Basin Levee District v. Earle, 169 La. 565, 125 So. 619 (1930); Board of Commissioners of Caddo Levee District v. Pure Oil Co., 167 La. 801, 120 So. 373 (1928).

According to the lease and the bond resolution, the State is required to pay the rental due the District to the trustee of the bondholders, and the argument is made that this arrangement creates an obligation between the State and the bondholders. The District has, as the amendment permits, pledged and assigned the proceeds of the hotel occupancy tax and the revenues derived from the project to the satisfaction of the bonds, nothing more. Furthermore, the bond resolution provides that the bonds themselves are required to contain the following inscription:

This Bond and the Bonds of the series of which it is one and the Bonds of the issue of which such series is a part shall not in any manner or to any extent (a) constitute or be a general obligation of the District nor a lien or charge upon any other revenue or property of the District not specifically pledged thereto

in and by the Basic Bond Resolution, or (b) constitute or be a debt of the State of Louisiana, *nor are the Bonds secured by the faith and credit of said State.* (Emphasis added.)

Such an inscription is contained in the sample bond approved by the resolution. Nowhere in the bond resolution, the lease agreement, the management or operating agreement or the bonds themselves is it stated that the faith and credit of the State is obligated to secure the bonds. To the contrary, as the resolution will verify, the faith and credit of the State is specifically disclaimed.

Nevertheless, despite the factors we have mentioned, which apparently negative the notion that the faith and credit of the State is obligated to secure the bonds, Arata and the intervenors insist that the lease is nothing more than a security arrangement, and not a bona fide lease. They urge that the nonterminable character of the lease and the unconditional promise to pay the rentals, which the State undertakes in the lease, without restricting the source from which the obligation will be satisfied, makes the lease a faith and credit transaction of the State. In essence, they assert that the State is doing indirectly what it cannot do directly.

Lease-financing of this kind, they declare, is actually borrowing by another name. Magusson, Lease Financing By Municipal Corporations As a Way Around

Debt Limitations, 25 Geo.Wash.L.Rev. 377 (1959); Morris, Evading Debt Limitations With Public Building Authorities: The Costly Subversion of State Constitutions, 68 Yale L.J. 234 (1958). The theory is that since the District is partially dependent upon the State for the income it will use to discharge its bond obligations, its debt to the bondholders may be treated, at least to that extent, as the State's.

In this State, however, we have approved this type transaction. In Smith v. Ascension-St. James Bridge and Ferry Authority, 241 La. 806, 131 So.2d 902 (1961), we considered a transaction whereby the Department of Highways agreed to pay the Authority $5,350,000 in installments over a twelve-year period in partial discharge of the bridge construction cost. We held that this arrangement did not involve the pledge of the State's faith and credit through the Department.

McLucas v. State Bridge Building Authority, 210 Ga. 1, 77 S.E.2d 531 (1953) dealt with facts essentially similar to the facts of the case at bar. Speaking for the Court the Chief Justice said:

They (the various provisions) are of equal dignity and to give full force and effect to the will of the people, as thus expressed, they must be construed together, being as they are in pari materia. The latter lifts out of the former any inhibition against the creation of a debt insofar as the creation of a debt is au-

thorized by the latter clause. Any other construction would render one of them meaningless, and we will not ascribe to the people an intention to adopt a constitution containing inconsistent provisions. (Parentheses added.)

If we brush aside the ostensible meaning of the transactions and accept the theory that underlying their stated purposes there exists, in reality, an obligation of the State securing the bonds, (at least to the extent of the difference between the payments required to service the bonds on one hand, and the revenue from the hotel occupancy tax plus the net income from the operation of the project on the other hand) we would still be confronted with the proposition that paragraph (S) is not for that reason alone violated. To constitute a violation the obligation of the State to the bondholders must, in addition, involve the State's faith and credit.

Although there is no decision of this court defining a "faith and credit" or a "full faith and credit" transaction (and we attach no significance to the difference, our opinion being that both terms have the same meaning), we conclude that the phrase is synonymous with "general obligation" transactions which

* * * include "only obligations that are supported by an unconditional promise to pay, directly or indirectly, an aggregate amount which (together with any other funds available for the purpose) will suf-

fice to discharge, when due, all interest on and principal of such obligations, which promise (1) is made by a governmental entity that possesses general powers of taxation, including property taxation, and (2) pledges or otherwise commits the full faith and credit of said promisor; said term does not include obligations not so supported that are to be repaid only from specified sources such as the income from designated facilities or the proceeds of designated taxes." 12 C.F.R. 250, 122(d) (1969)

For the use of the term full faith and credit in our Constitution and statutes see: La.Const. art. 4 §§ 1(a) & 2; art. 6 §§ 23(2), 23.1(1) (a) & 33 (L); art. 14 § 24; La.R.S. 39:832, subd. C(1) & (2), 39:1362. Other authorities use the term but do not define it precisely: State ex rel. Kemp v. Board of Liquidation of State Debt, 214 La. 890, 39 So.2d 333 (1949); Miller v. Greater Baton Rouge Port Commission, 225 La. 1095, 74 So.2d 387 (1954); Caldwell Brothers v. Board of Supervisors of Louisiana State University, 176 La. 825, 147 So. 5 (1933). All of the authorities cited, though failing to provide a definition of full faith and credit, apply the phrase in a manner which is compatible with the definition we have quoted and approve.

■ Conceding arguendo that the lease transaction is a full faith and credit obligation of the State undertaken to secure the bonds, the assumption would require a de-

cision that the lease runs counter to paragraph (S). But, we must then consider this conclusion in the light of paragraph (E) of the same constitutional amendment, because all of these provisions were enacted at the same time and deal with the same subject matter. They are laws in pari materia and must be construed together. La.Civil Code art. 17; 2 Sutherland, Statutory Construction Sec. 5204 (3rd ed. 1943); Crawford, Statutory Construction, Secs. 231–232, 427 (1940). This is the error into which the trial judge fell. He failed to give other than cursory attention to paragraph (E) and attached overriding significance to paragraph (S).

Reference to paragraph (E) immediately impresses the reader with one dominant idea. It is a constitutional grant of authority which cannot be modified, altered or impinged upon by any other constitutional or statutory provision. And though, under accepted principles of statutory interpretation, resort may be had to extrinsic sources to explain what is unclear, no other authority can modify what is clear and unambiguous in its text.

Paragraph (E) grants the State of Louisiana the right and authority to lease the facilities of the District and "provide for the payment of the consideration therefor through the appropriation of funds or otherwise." It sets forth in plain and unambiguous language that "The obligations of the lessee (State) or lessees under any such lease shall constitute a charge against the revenues of such lessee or lessees." (Parentheses added.)

Thus, paragraph (E) embodies an authorization to the State to pay the consideration of the lease "through the appropriation of funds", and it provides that the obligations of the State under the lease "shall constitute a charge against the revenues of such lessee (the State)." (Parentheses added.) Under this authorization, because the State may "appropriate funds" for the payment of the lease rentals and the obligations under the lease "constitute a charge against the revenues" of the State, the authorization comprehends all those commitments which are components of a transaction involving the full faith and credit of the State.

The right of the State to "appropriate funds" to discharge an obligation is the right to commit itself unconditionally from its entire resources. In the same manner, when an obligation "constitutes a charge against the revenues" of the State, it is in reality a full faith and credit transaction, for a State's revenues are derived from many sources. Primarily revenue is obtained from the State's general power of taxation, including property taxation. A charge against the State's revenues is therefore a charge against its general taxing power. The definition of "full faith and credit" makes it clear that when this taxing power is available to secure a transaction the es-

sential element of a full faith and credit or general obligation transaction is satisfied.

From these syllogisms we reach the conclusion that, unlike paragraph (S) which denies the right to secure the bonds by the faith and credit of the State, paragraph (E) authorizes and permits the State to encumber its faith and credit for the satisfaction of the rental and other considerations of the lease and sets forth how that result is to be accomplished. The two provisions are diametrically opposed. Both were adopted with full knowledge and understanding that the proceeds from the lease would be pledged to secure the bonds, for that authorization is repeatedly mentioned in the amendment. Issuing bonds and pledging the revenues from leases is part of the general scheme which the amendment authorizes. Hence it is implicit in paragraph (E) that the faith and credit of the State would be used to secure the bonds by a pledge of lease rentals. 3 Sutherland, Statutory Construction, Sec. 5817 (3d ed. 1943).

Since paragraphs (S) and (E) are irreconcilable, we must ascertain which prevails. We hold that paragraph (E) prevails over paragraph (S) and all other provisions of the Constitution and statutes of this State.

Considered in the context of the issues presented for our adjudication it is the paramount law. Its position as such is so clearly and emphatically stated that we cannot decide otherwise. The phrase "Any other provisions of the Constitution and laws of the State to the contrary notwithstanding * * *" has long been used to insulate constitutional and statutory provisions from modification and to elevate the law containing that phrase above other laws on the same subject with which it may conflict. Further, paragraph (E) permits the State to lease the project and pay the rentals by appropriations and from its revenues "without compliance with any other constitutional or statutory provisions." This means that paragraph (S) must be relegated to a subordinate position in relation to paragraph (E). These phrases of paragraph (E), we feel, are a recognition by the Legislature and the people who adopted this constitutional amendment that inconsistent constitutional provisions and statutes existed, and for this reason it was deemed necessary, by the use of these phrases, to make it clear which of these conflicting provisions was to prevail. The words of paragraphs (E) and (S) do not permit them equal dignity. Paragraph (E) must prevail, and, insofar as paragraph (S) purports to inhibit paragraph (E), we rule that paragraph (S) is ineffective.

It is also pertinent to point out that paragraph (E) is a special provision, whereas paragraph (S) is general in its terms. Where one provision of a constitution or

statute deals with a subject in general terms, and another deals with the same subject in a more detailed way, the two should be harmonized if possible, but if there is any conflict, the latter will prevail. 2 Sutherland, Statutory Construction, Sec. 5204 (3d ed. 1943).

It is the general rule that where the general statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment. Where the special statute is later it will be regarded as an exception to or qualification of the prior general one; and where the general act is later the special statute will be considered as remaining an exception to its terms unless it is repealed in general words or by necessary implication. People v. Breyer, 139 Cal. App. 547, 550, 34 P.2d 1065, 1066 and cases cited there.

Evidence was introduced that two members of the House of Representatives in the Legislature, which adopted the joint resolution upon which the amendment is based, firmly believed that paragraph (S) was inserted to override all of its other provisions. They are intervenors here seeking to set aside the transactions at issue. The understanding of these two members, however, does not establish a consensus of the 105 members of the House and 39 members of the Senate which we would consider necessary to establish the legislative intent. Moreover, we are not considering a legislative enactment as such, and the intention of the Legislature is not of prime importance. It is the intention of the people who voted for and adopted the amendment which is our primary concern. And since this intention would be difficult if not impossible to ascertain, we have been guided by the literal meaning of the amendment; we would do that in any case where the words are clear and unambiguous as they are here. The intention of the law is first to be sought in the words of the law itself. And "When a law is clear and free from ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit." La.Civil Code art. 13.

In accordance with universal practice, and from the very necessity of the case, amendments to an existing constitution, or entire revision of it, must be prepared and matured by some body of representatives chosen for the purpose. It is obviously impossible for the whole people to meet, prepare, and discuss the proposed alteration, and there seems to be no feasible mode by which an expression of their will can be obtained, except by asking it upon the single point of assent or disapproval. But no body of representatives, unless specially clothed with power for that purpose by the people when choosing them, can rightfully take definitive

action upon amendments or revisions; they must submit the result of their deliberations to the people—who alone are competent to exercise the powers of sovereignty in framing the fundamental law—for ratification or rejection * * * the changes in the fundamental law must be enacted by the people themselves. 1 Cooley, Constitutional Limitations p. 87 (8th ed. 1927)

Finally, the validity of Act 556 of 1966 was questioned in the lower court on the ground that the Legislature failed to comply with the procedural requirements of Section 1 of Article 21 of the Constitution. The District Court correctly rejected this contention, and it has not been urged on this appeal. Accordingly, we consider the issue abandoned along with the attack on the hotel occupancy tax, since the contention for invalidity of this tax ordinance was predicated upon the claimed invalidity of Act 556.

▆ Throughout their presentation in this litigation, the intervenors have implanted the theme that the actions authorized by this amendment, aside from being invalid, are unwise and founded upon poor financial judgment. We need not express an opinion on this latter issue for courts cannot question the wisdom of the fundamental law in this State and frustrate the will of the people.

Our function is to interpret and apply that law. La.Civil Code art. 20.

For the reasons assigned, the judgment of the District Court is reversed, the injunction issued pursuant thereto is recalled, and the transactions under attack are declared to be constitutionally valid.

McCALEB and HAMLIN, JJ., and FOURNET, C. J., dissent.

McCALEB, Justice (dissenting).

Being of the view that the provisions of the lease herein obligating the State of Louisiana, as lessee, to pay "base rentals" annually in the amount required to pay the bonds issued by the Louisiana Stadium and Exposition District constitute an indirect, if not a direct, violation of the prohibition set forth in Paragraph (S), § 47 of Article 14 of the constitutional amendment, that "No bond issued under this amendment shall be secured by the faith and credit of the State", I think the judgment of the trial court should be affirmed.

Actually, I perceive little difference, except as to the end result, between the views I entertain and those *realistically* expressed in the majority opinion. Preliminarily, that opinion would view the transactions between the State and its alter ego, the District, " * * * superficially and in a technical sense," and concludes that, when thus considered, the

bonds are not secured by the faith and credit of the State for several reasons.

However, it is apparent from the opinion, if I read and understand it correctly, that the Court is unwilling to rest its decision upon superficial or technical considerations for, thereafter, the opinion considers the obligation of the State in its true light—that is, "* * * an obligation of the State securing the bonds, (at least to the extent of the difference between the payments required to service the bonds on one hand, and the revenue from the hotel occupancy tax plus the net income from the operation of the project on the other hand) * * *." In other words, as the Court later shows, this is a full faith and credit transaction, for the State is obligating itself unconditionally for the payment of these bonds as guarantor in the event the hotel occupancy tax and the Stadium's yearly net income are insufficient to meet the obligation to the bondholders. In deducing that Paragraph (E) of § 47 of Article 14 of the Constitution plainly contemplates that the obligation of the State under the lease is a full faith and credit transaction, the Court states:

"Paragraph (E) grants the State of Louisiana the right and authority to lease the facilities of the District and 'provide for the payment of the consideration therefor through the appropriation of funds or otherwise.' It sets forth in plain and unambiguous language that 'The obligations of the lessee (State) or lessees under any such lease shall constitute a charge against the revenues of such lessee or lessees.' (Parentheses added.)

"Thus, paragraph (E) embodies an authorization to the State to pay the consideration of the lease 'through the appropriation of funds', and it provides that the obligations of the State under the lease 'shall constitute a charge against the revenues of such lessee (the State).' (Parentheses added.) Under this authorization, because the State may 'appropriate funds' for the payment of the lease rentals and the obligations under the lease 'constitute a charge against the revenues' of the State, the authorization comprehends all those commitments which are components of a transaction involving the full faith and credit of the State.

"The right of the State to 'appropriate funds' to discharge an obligation is the right to commit itself unconditionally from its entire resources. In the same manner, when an obligation 'constitutes a charge against the revenues' of the State, it is in reality a full faith and credit transaction, for a State's revenues are derived from many sources. Primarily revenue is obtained from the State's general power of taxation, including property taxation. A charge against the State's revenue is therefore a charge

against its general taxing power. The definition of 'full faith and credit' makes it clear that when this taxing power is available to secure a transaction the essential element of a full faith and credit or general obligation transaction is satisfied."

I am in accord with the above-quoted observations, but I do not subscribe to the ultimate conclusion of the majority that, because Paragraph (E) of § 47 vests the power to pledge the faith and credit of the State to secure the payment of the rental to be stipulated in the lease, this paragraph is necessarily inconsistent with Paragraph (S) and, therefore, it must prevail over the latter paragraph, which is rendered ineffective on the theory that Paragraph (E) is a special provision whereas Paragraph (S) is a general provision.

The issue here, as I see it, does not involve the question whether either Paragraph (E) or Paragraph (S) should prevail over the other. There is but one constitutional amendment, and all of its provisions should be considered and read together in order to determine the intent of the people. This Court is without authority to strike down any provision as unenforceable, unless it is impossible to give it effect. And, if there by any inconsistency as to the authority granted in one provision (Paragraph [E]), that authority must necessarily be curtailed when it is used in a manner so as to defeat the plainly-stated limitation contained in Paragraph (S), that "No bond issued *under this amendment* shall be secured by the faith and credit of the State." (Italics mine.)

Paragraph (S) is not a general provision in my judgment; it is simply a special limitation under which no bonds issued by the District may be secured by the faith and credit of the State. Paragraph (E) is likewise a special provision, insofar as it authorizes the State to make a lease with the District, which of course is a hybrid sort of thing, as the District is nothing but an agency of the State. The provision that authorizes the State to pledge its faith and credit for the payment of the lease rental does not necessarily conflict with the prohibition contained in Paragraph (S), save and except, that the State, by the lease contract it confected, has guaranteed payment of the bonds. Because of this pledge, the contract comes into collision with Paragraph (S) and, hence, the obligation is violative of the prohibitory provisions of the amendment.

In final analysis the decision today, in striking down Paragraph (S), thwarts, in my humble opinion, the will of the people who unquestionably adopted the constitutional amendment under the well-founded belief that no bond issued by the District would be secured by the faith and credit of the State.

I respectfully dissent.

HAMLIN, Justice (dissenting).

It is my opinion that the ruling of the trial judge in this case is correct.

Try as I will, I cannot disassociate myself from my belief that defendants are attempting to do indirectly what they are prohibited by the Constitution from doing directly; that is, placing the full faith and credit of the State behind the bonds.

It is my view that my belief is sustained by a document entitled, "PRESENTATION to the LOUISIANA STADIUM and EXPOSITION DISTRICT," by Kohlmeyer & Co./Blyth & Co., Inc./Financial Advisors, filed in this Court on June 13, 1969, which contains the following language on page 10 thereof:

"* * * *In arriving at our recommended financial program we have studied virtually every major municipal stadium project which has been financed during the past fifteen years. In each other such major stadium financing, sources of income other than just stadium revenue have been pledged to secure the bonds issued, and generally the credit and taxing power of a state or large city or county has been directly or indirectly pledged.*

"Based on such research and our knowledge of the existing municipal bond market *we are of the opinion that an ad-ditional revenue source must be used to secure the District's Bonds and accordingly it is our recommendation that the District enter into the described lease with the State."* (Emphasis mine.)

My belief is further sustained by the holding in the majority opinion that the right of the State to "appropriate funds" to discharge an obligation is the right to commit itself unconditionally from its entire resources.

It would be unwise to overlook the contingency that the revenues from the Hotel Occupancy Tax, and otherwise, may not be sufficient to meet the obligation of the bonds. Should such an event occur, the taxpayers of this State will be faced with the dreadful, frightening situation of additional taxation to pay the bonds.

I respectfully dissent.

BARHAM, Justice (concurring).

Plaintiff's principal attack is that the stadium district's bond resolution and the acts executed in response thereto are unconstitutional, being contrary to the provisions of Paragraph (S) of the constitutional amendment which created the district (Art. 14, Sec. 47), because the transaction pledges the faith and credit of the State for that district's bonds.

We have held that the resolutions of such districts, subdivisions, and boards of this state are considered to be in parity

with the ordinances of municipalities and parishes for the purpose of determining the applicability of Article 7, Section 10(2), of the Louisiana Constitution. Melancon v. State Board of Education, 249 La. 604, 188 So.2d 419. The laws of this state, the ordinances of municipalities and parishes, the resolutions of boards, districts, and other subdivisions are presumed to be valid and constitutional, and such acts are to be respected. The good faith of the bodies which pass the acts and their intent and ability to act constitutionally are presumed.

When such an act is susceptible of more than one interpretation, the courts are con-strained to give that construction, wherever possible, which upholds its constitutionality. A statute, ordinance, or resolution may not be held repugnant to the Constitution on slight implication or conjecture, but may be held unconstitutional only when the op-pugnancy is clear, complete, and unmistakable. These general principles of legal construction and interpretation have been spelled out so many times by United States Supreme Court cases, decisions of this court, and works of commentators and writers that no specific citation of authority is necessary.

Paragraph (S) of the constitutional amendment in question makes a general provision that the faith and credit of this State shall not be pledged to *secure the bonds* of the district. Paragraph (E) of that same amendment contains a specific authorization for the district to lease to the State and for the State to make appropriations and pledge its revenues to *discharge the lease obligations,* "Any other provisions of the Constitution and laws of the State to the contrary notwithstanding".

We first presume that the people of this state would not incorporate conflicting provisions in the same constitutional amendment, and we must therefore construe the provisions of the amendment with a view toward reconciling them if this is possible.

Beginning, then, with the presumption of the constitutionality of the district's acts. and the principle of recognizing and re-conciling provisions of the Constitution when possible, I readily conclude that Paragraph (S) intends that the faith and credit of the State shall not be pledged to the *bonds,* whereas Paragraph (E) envisions and specifically authorizes the leasing of the district's facilities to the State and the State's payment therefor "through the appropriation of funds or otherwise". Paragraph (E) of the constitutional amendment expressly provides that *the obligations of the State under such a lease* "shall constitute a charge against the revenues" of the State. Hence the revenues of the State have not been pledged to secure the *bonds;* they have been pledged to secure *the lease payments,* which in turn help to secure the bonds. Paragraph (E) and Paragraph (S) must be placed in juxtaposition, and. when they are read together, both have:

meaning and effect. It is wholly within the power of the people to forbid directly, as they have, the pledge of faith and credit to the district's bonds and yet to accomplish indirectly a similar result by providing for a pledge to a lease of revenues which are in turn pledged by the district to assist in retiring the bonds. Paragraph (S) forbids only a pledge of the State's faith and credit to the bonds. Nothing in the entire amendment forbids the pledging of the State's revenues to discharge this lease obligation even though the lease price may be pledged by the district to assist in the discharge of its bonded indebtedness. To the contrary, Paragraph (E) provides explicitly, expressly, and unambiguously for exactly this procedure and this result.

Finally, if we were confronted with total conflict and irreconcilable opposition between Paragraphs (S) and (E) of the amendment, we would be forced to give effect to the particular rather than to the general. Paragraph (E) is particular, and its language is precise. The people have declared, in effect, that if any other provision of the Constitution is in conflict therewith, Paragraph (E) should prevail; and the court must adhere to that concise dictate.

McLucas v. State Bridge Building Authority, 210 Ga. 1, 77 S.E.2d 531 (1953), which is cited by the majority, correctly disposes of the issue before us. I paraphrase language of that case: Paragraphs (E) and (S) are of equal dignity, and in order to give full force and effect to the will of the people as thus expressed, they must be construed together, being as they are in pari materia. Paragraph (E) lifts out of Paragraph (S) any prohibition against the pledge of faith and credit of this State insofar as the pledge of faith and credit of this State is authorized by Paragraph (E) (*if*, indeed, the pledging of revenues and appropriations to the lease obligation is a pledge of faith and credit). Any other construction would render one of them meaningless, and the court will not ascribe to the people an intention to adopt a constitutional amendment containing inconsistent provisions.

It is argued that the entire transaction is a subterfuge to contravene the mandate of the constitutional amendment. The transaction is no subterfuge, for the district exactly followed the authority provided by the constitutional amendment in effectuating a lease with the State and pledging the revenues from the lease to assist in retiring the bonds which it had issued. Perhaps, as argued, the people were led to support the proposed amendment because of misrepresentation and their consent was obtained through subterfuge, but such an assumption does not release us from our obligation to make our determination within the confines of that amendment and upon its express language.

Paragraph (S) prohibits the pledge of the State's *faith and credit to secure the bonds* issued by the district; but Paragraph (E) provides that the State may pledge its revenues to secure a lease on the property of the district, and Paragraph (F) provides that the district may in turn pledge these revenues to payment on its bonds. Paragraph (E) is so concise, express, and unequivocal as to be susceptible of only one interpretation. Within this constitutional amendment the people have forbidden the State to pledge its faith and credit to the bond issue of the district, but also within that amendment they have authorized the State to lend stability to these bonds through lease of the facilities and pledge of its revenues for the payment of the lease. Without regard to why the people were so motivated, these provisions are the clear expression of the desire of more than two-thirds of the voters, and represent the will of the people.

It is not within the power of this court to pass judgment upon the discernment, the sapience, the logic, the motives, the values of the people when they act through constitutional amendment. We may not test the merit of their decisions or the consequences of their actions.

The greatest danger to the people from the exercise of the judicial power is that there may be a usurpation by the courts of the people's right to express in law their collective reason. Our obligation is to dis-

passionately apply and implement the people's will as expressed through democratic process. We cannot substitute our determination of what is good and what is bad, what is wise and what is foolish, what is propitious and what is imprudent, what is beneficial and what is improvident, what is economically sound and what is extravagant.

A court in sympathy with those who originally were opposed to, or who have since become disillusioned and disenchanted with, the proposed domed stadium project could easily make a personal-value judgment on this issue. But such court decisions, founded as they are in the emotions, politics, character, or philosophy of the particular judges, are those which are now so loudly decried by the vast majority of the American people and which rightfully bring criticism of the courts. A personal determination, a value judgment cannot be substituted for the law because it accords with a judge's own feelings or pleases the crowd at the moment, or because it reflects what the court conceives to be in the best interest of the people. Such a judgment, no matter how well intentioned, waves the warning light for free people.

We cannot question the object or motive of the people and their representatives, but only their authority and power. Our function is not to apraise the worthiness of their acts, but only to determine whether their acts are legal.

I firmly believe that the law in general and this constitutional amendment in particular compel a declaration by this court that the acts of the district under this amendment are constitutional.

For these reasons I concur.

FOURNET, Chief Justice (dissenting).

I fully recognize the need for a domed stadium in the metropolitan center, just as I am sure we all realize the need for so many other vital facilities to improve the economic, social, and cultural environment of this city so that the image it once held as the "Queen City of the South" and the cultural center of the new world may be regained. Nevertheless, with due respect to my colleagues who hold the majority view, and for whom I entertain the highest regard and respect, I could not, in good conscience, join them. And, because of the great importance of the issues in this case, I am impelled by the duties of the office I have held for so long to express my reasons for not subscribing to their view.

The Board of Commissioners of the Louisiana Stadium and Exposition District, availing itself of the provisions of Section 47 of Article XIV of the constitution of Louisiana, adopted pursuant to Act 556 of 1966, entered into a contract termed a "Lease Agreement" with the State of Louisiana for the acquisition, construction, and operation of an enclosed and covered multipurpose stadium, together with parking and other facilities relative and appertaining thereto. Executed contemporaneously therewith were implementing documents termed the "Bond Resolution" and the "Management and Operating Agreement."

The matter is now before us on an appeal from a judgment of the district court declaring the lease agreement and implementing documents to be unconstitutional, null, and void, and enjoining defendants from carrying out their provisions or expending any sums whatsoever in the execution of the lease.

The lease agreement was entered into pursuant to paragraph (E) of Section 47 of Article XIV, which authorizes the state, *"Any other constitutional or statutory provisions * * * to the contrary notwithstanding,"* to lease the facilities of the stadium district "and provide for the payment of consideration therefor through the appropriation of funds or otherwise," and the obligations of the state as lessee under such an arrangement "shall constitute a charge against the revenues" of the state "to the extent and in the manner agreed upon by the parties thereto." (The emphasis has been supplied.)

While the validity of the lease contract is attacked on several grounds, as pointed out in the main opinion the principal thrust of the attack "has been centered upon the argument that adoption of the bond resolution and execution of the lease and man-

agement agreement have obligated the faith and credit of the state as security for the bonds to be issued by the district contrary to paragraph (S)" of the amendment, which provides that "No bond issued under this amendment shall be secured by the faith and credit of the state."

The learned trial judge in resolving this issue in a well-considered opinion reasoned that under the broad grant and power conferred in paragraph (E) of the amendment the state has, in the lease, unconditionally pledged the full faith and credit of the state to pay the bonds issued by the stadium district and all expenses connected therewith, thus, under a device denoted as "rentals," seeking to accomplish indirectly that which is directly prohibited in paragraph (S) of the amendment, as well as by Sections 2 and 12 of Article IV of the constitution;[1] further, that in the event the state defaults on the lease, it has also assumed, through a device termed "additional rentals," the payment of all costs and expenses the stadium district incurs in connection with

its administrative duties in running the project, in further contravention of these sections.

The trial judge's conclusion in this respect is predicated upon the fact that the "base rental" provided in the lease is "an amount equal to the amount required * * to pay the interest and principal and redemption premiums, if any, on all bonds becoming due," as well as the fees, expenses, and all bank charges in connection with the payment of the bonds," and this is to be appropriated annually and paid directly into a "Bond Fund" created in the bond resolution, while the "additional rental" includes a sum equivalent to all costs and expenses the district may incur in the event the state defaults in any respect under the lease, including attorney fees and the costs. of *any suit or action the district may institute to enforce the terms and conditions of the lease.*[2]

It is apt to observe that the obligations. thus undertaken by the state are to continue so long as there are any outstanding

1. Section 2 provides "the Legislature shall have no power to contract directly or through any state board or state agency the incurring of debt or the issuance of bonds involving the dedication of all or any part of the tax revenues imposed and collected by the state except upon the two-thirds vote of the elected membership of each of the Houses and then only if the funds are to be used to make capital improvements, repel invasion or suppress insurrection." Section 12 provides that "The funds, credit, property or things of value of the state, or of any

political corporation thereof, shall not be loaned, pledged or granted to or for any person or persons, associations or corporations, public or private * * *."

2. The trial judge also points out that there is a "further additional rental" that will obligate the state to pay all of the expenses connected with the bonds, the bonds themselves, and the administration of the project, including insurance premiums, as long as there are any bonds outstanding, in the event the state dismisses the district as the operator and manager of the stadium.

bonds, even though the stadium is never completed, or is damaged and/or destroyed and not repaired or rebuilt.

The main opinion, with three justices agreeing, concur, as I do, in the trial judge's conclusion that the obligation of the state under the lease as thus outlined constitutes a pledge of the full faith and credit of the state to the discharge of the bonds, as well as the other expenditures of the stadium district that the state will be called upon to make under the other numerous provisions of the lease and management and bond resolution agreements, while the fourth member of the court forming the majority felt "It is wholly within the power of the people to forbid directly, as they have, the pledge of faith and credit to the district's bonds and yet to accomplish indirectly a similar result by providing for a pledge to a lease of revenues which are in turn pledged by the district to assist in retiring the bonds."

The conclusion is inescapable, therefore, that the overwhelming majority of the court, as the other dissenting opinions will further reflect, are of the opinion that the full faith and credit of the state has been pledged in this lease and its implementing agreements to secure the bonds issued by the stadium district, in circumvention of the express provisions of paragraph (S) of the very amendment authorizing their execution and confection, and in direct violation of the provisions of Sections 2 and 12 of Article IV of the constitution.

In thus placing the stamp of constitutionality on such circumvention of the prohibition in paragraph (S) the majority, as pointed out in the main opinion, was particularly impressed with the dominant idea that paragraph (E), because it contains the phrase "Any other provisions of the Constitution and laws of the State to the contrary notwithstanding," "is a constitutional grant of authority that cannot be modified, altered or impinged upon by any other constitutional or statutory provision," and since the two paragraphs in the same amendment are irreconcilable, it must be held *"paragraph (E) prevails over paragraph (S) and all other provisions of the Constitution and statutes of this State."* (The emphasis has been supplied.)

Although the majority profess the will of the people must be carried out, they obviously overlook the fact that by ignoring and deleting paragraph (S), specifically included as a limitation on the authority granted under the amendment, they are actually thwarting the will of the people.

I feel we should take judicial cognizance of the fact that in giving their stamp of approval to this amendment the people did so on a ballot that provided only:

FOR or AGAINST "the proposed amendment to Article XIV of the Constitution of the State of Louisiana of

1921, adding a new Section 47 thereto, creating the Louisiana Stadium and Exposition District and prescribing the powers and duties thereof,"

and that their favorable action was undertaken in the light of the information disseminated by the news media, as well as that carried to all parts of the state through a public relation campaign and representatives of those having a personal interest in the project. This was to the effect that under the amendment the people were simply authorizing the creation of the "Louisiana Stadium and Exposition District," whose function would be to construct a covered stadium and to issue in the neighborhood of $30,000,000 in revenue bonds to pay therefor, with the assurance this would not cost the state one penny as the bonds would not be secured by the faith and credit of the state. They never dreamed they were, in fact, authorizing the state to issue approximately $100,000,000 in bonds that were secured by the full faith and credit of the state.

The majority, besides flouting the will of the people and ignoring the wisdom of the members of the legislature as representatives of the people in including the limitations of paragraph (S) in this amendment to Article XIV of the constitution, has, additionally, by deleting the provisions of paragraph (S), amended Sections 2 and 12 of Article IV of the constitution without reference to these sections, contrary to the provisions of Section 1 of Article XXI of the constitution. This has the effect of rendering the entire amendment null and void. See, Graham v. Jones, 198 La. 507, 3 So.2d 761.

I am fortified in these conclusions for those preparing the lease agreement and its implementing documents, cognizant that paragraph (S) and its provisions constituted a limitation on the authority conferred by the amendment, provided the bonds themselves should carry in the inscription the stipulation that they *"shall not in any manner or to any extent * * (b) constitute or be a debt of the State of Louisiana, nor are the Bonds secured by the faith and credit of said State."* (The emphasis has been supplied.)

In an effort to bolster this scheme, however, the drafters of these agreements sought to impress the prospective bond market with the fact that the payment of the bonds was enforceable by including in the lease agreement the provision that the district has the right to sue or take any action at law needed to enforce its terms. And to facilitate this it was stipulated in the lease agreement that the covenants undertaken by the state *"shall be construed to be ministerial duties imposed by law and it shall be the ministerial duty of each and every public official of the lessee [state] to take such action and do such things as are required by law in the performance of such official duty."* (The emphasis and

material within brackets have been supplied.)

I cannot conceive of an independent and responsible legislature, in the face of the limitations in paragraph (S) and the specific stipulation in the bonds themselves to this same effect, appropriating annually the large sums that will be required to pay the bonds, purported to be "rentals," and now estimated to represent a face value that may well exceed $100,000,000—not the $30,000,000 the legislature and the people were led to believe it would cost when they approved the project—as well as such other enormous sums as the state is obligated to pay over and above the bond debts under the terms of these documents.

Nor can I envision under our form of government any power or authority vested in the judicial branch to coerce the legislative department to make such appropriations upon the mere ipsi dixit of the executive branch in this scheme to circumvent the prohibitions of paragraph (S) of Section 47 that the acts of the public officers and officials of Louisiana in carrying out the covenants of the lease constitute "ministerial duties."

For the foregoing reasons, I respectfully dissent.

FOURNET, C. J., and HAMLIN, J., dissent from the refusal of a rehearing.

McCALEB, J., will not participate because of his absence.