255 So.2d 754

**Dr. Charles C. BERTRAND et al.**

**v.**

**Sidney J. SANDOZ et al.**

**No. 51640.**

Dec. 13, 1971.

———◆———

Robert Brinkman, Opelousas, for plaintiffs-appellants.

McCollister, Belcher, McCleary & Fazio, James S. Holliday, Jr., Baton Rouge, for defendants-appellees.

ON CERTIFICATION OF QUESTION TO THE SUPREME COURT OF THE STATE OF LOUISIANA FROM THE THIRD CIRCUIT COURT OF APPEAL

SUMMERS, Justice.

By amendment to the constitution in 1948, Article XIV, Section 14(d–2),* was adopted permitting the legislature to authorize police juries to create hospital service districts. Within limitations embodied in the constitutional amendment, the legislature was empowered to authorize hospital service districts so created to incur debt and issue bonds for the purpose of acquiring both real and personal property to be used in providing hospital service. Further, hospital districts, if authorized by the legislature, were empowered to levy limited taxes provided the rate, purpose and duration of the tax be submitted to the resident property taxpayers qualified to vote as required by Article X, Section 10, of the constitution.

By this Article XIV, Section 14(d–2), hospital service districts so created were considered subdivisions of the State, and the general provisions of the constitution pertaining to authorization, issuance and payment of bonds by subdivisions of the State were made applicable to hospital service districts.

Acting pursuant to this constitutional delegation, the legislature enacted Act 420 of 1950, which, with subsequent amendments, is now designated as Chapter 10 of Title 46 of the Revised Statutes (La.R.S. 46:1051–1068). This legislation authorizes police juries to create hospital service districts, the objectives of which shall be to own and operate hospitals and to administer other activities related to the care of the sick and injured; to conduct scientific research and training related to the care of the sick and injured; to participate in activity designed to promote the general

* Inadvertently two subsections d-2 appear in Article XIV, Section 14. One pertains to airport districts, the other to hospital service districts. We are only concerned with the latter.

health of the community; and to cooperate with other institutions providing hospital and health services within the district.

These districts are to be governed by a board of commissioners appointed by the police jury, its power and duties being set forth in the act. Included within the power and duties of the board is the authority "[T]o enter into lease agreements with recognized and duly constituted non-profit associations which are primarily engaged in the operation of hospitals."

By this legislation, hospital service districts thus created are declared to be political subdivisions of the State and to constitute a body corporate in law with all powers of a corporation with perpetual existence. The power is granted to incur debt and contract obligations and to do and perform any and all acts necessary and proper for carrying out the purposes for which the hospital service district is created. The districts are, moreover, empowered to do such things and enter into contracts with any state instrumentality to procure aid and grants necessary to assist the districts in carrying out the purposes for which they are created.

Relying upon the constitutional and statutory authority thus enacted, the police jury of St. Landry Parish adopted an ordinance on July 6, 1953 creating Hospital Service District No. 2 providing that the district was a subdivision of the State with powers and privileges granted by the constitution and statutes of this State, including the authority to incur debt, to issue bonds and levy taxes. The commissioners were named, and the district began its function.

On September 21, 1954 the district proposed, and the voters approved, a bond issue for $350,000 to be financed by a one-mill ad valorem tax. With these funds and Hill-Burton Act assistance, some donations and a small allotment from State severance taxes, grounds were acquired and buildings erected. A lease was granted for the operation of the facility to the Hospital Corporation of the Sisters Marianites of the Holy Cross, an association engaged in the operation of hospitals.

The hospital thus established at a cost of $892,184 opened with a capacity of 47 beds on May 27, 1957. It was then a three-story structure with only two floors completed. The third floor was only a shell with plans for its completion at a later date.

Almost from the beginning the hospital succeeded financially as a result of rapid growth in admissions and in the over-all level of operations. The third floor was completed with an additional 44 beds and put into use in 1964 to serve the increasing patient load. At the same time, services were expanded. These improvements were financed from additional Hill-Burton funds and accumulated revenues from hospital

earnings almost without additional cost to the taxpayer. The one-mill operating and maintenance tax was allowed to expire in 1965, and the one-mill tax for servicing the original bonds will expire when the bonds are retired in 1975. Another $395,905 was invested for additional land, facilities and for fixed and movable equipment.

The successful financial operation of the hospital reflects the rapid expansion in its use and the services it provides to the community. Hospital admissions increased from 2,669 in 1965 to 5,491 in 1969. By the first three months of 1970 the hospital was operating at over 90 percent of capacity—a capacity deemed too great to permit the hospital to cope with unforeseen emergencies, epidemics or major catastrophes. The unexpected demand for and use of the facilities is accounted for by the population growth in the area, the increasingly receptive attitude of the people toward hospital care and the advent of Medicare.

It is thus apparent that since the beginning of 1970 the need for expansion has been acute. It is estimated that the hospital could utilize an additional 150 beds immediately if all patients in the community needing hospitalization were admitted. It is also required that the district meet the accumulated needs for renovation, replacement and improved equipment. In keeping with these requirements, plans were formulated by the district in 1970 to provide for modernization and expansion, including a new building or wing adjoining the existing facility. Contemplating the use of Hill-Burton Funds ($500,000), Hospital District Surplus ($122,000), Hospital Corporation Surplus ($128,000) and a proposed bond issue by the district of $1,600,000, the plan proposed the expenditure of $2,350,000.

The bond proposal was submitted to the voters of the district on January 12, 1971, and it was soundly defeated. Strangely, there was no active community opposition to the proposal. On the contrary, there was a broad recognition of the need for expansion and renovation of the hospital facility. But the mood of the voters was generally against new taxes. This was the mood of a citizenry manifested in the statewide defeat of all fifty constitutional amendments which had recently been proposed by the legislature.

Interested parties who realized the critical need for the improvement persisted. By consultation with financial advisers it was ascertained that the recently enacted Public Trust Act, Act 135 of 1970 (La.R.S. 9:2341–2347), authorized the creation of express trusts with public bodies as beneficiaries to finance public projects from self-generated revenues. This act is based upon Article IV, Section 16, of the Constitution which empowers the legislature to "authorize the creation of express trusts for any purpose . . . . " It was learned then that a similarly financed project in Oklahoma had been approved by the Oklahoma

Supreme Court and that this method of financing had been employed in that state for twenty years. Also, according to the testimony of Dean William D. Ross, the financial expert who testified on behalf of the project, it is a method in use to finance acquisition and maintenance of facilities at Louisiana State University.

Financial advisors then recommended "the creation of a Public Trust to be known as the Opelousas General Hospital Authority through which revenue bonds supported entirely by self-generated Hospital revenues would be used to finance the needed renovation and expansion project." Specifically, under this recommendation, there will be no obligation whatever on the part of the police jury or the hospital district or any of the commissioners individually for any of the debts or obligations incurred by the trust known as the Opelousas General Hospital Authority. There will be no provision for any direct mortgaging or other encumbrance of any property of the district. Instead the district will grant a long term lease of its facilities to the trust. In turn the trust will grant a pledge or mortgage of the lease and added facilities for the life of any bonds which are issued. The bonds will be secured by the revenue generated by the operation of the hospital, that is, the existing facilities plus the facilities to be added under the expansion project. In the event of a default in the bond payments, bondholders would acquire a right to direct the use of the facilities in an effort to improve operating efficiency and to produce the revenue required to satisfy their claims. In short, the bondholders would acquire no greater right than that acquired by the trust by virtue of the lease. And, upon discharge of the bonded indebtedness, the lease would terminate, and the trust would dissolve.

This recommendation was accepted, and by unanimous action of members present, the commissioners of the district authorized the creation of the public trust, adopted a resolution accepting the role as beneficiary of the trust and approved other necessary action to effectuate the plan. Under the terms of the trust indenture the trustees of the Opelousas General Hospital Authority (the public trust) are the same five persons who serve as commissioners for the district. Community reaction to the proposed renovation and expansion project and to the self-supporting aspects of the plan has been very favorable.

The plan includes the expenditure of $800,000 for modernization of existing facilities, $400,000 from accumulated surpluses and earnings on invested funds and $400,000 from Hill-Burton matching funds. The revenue bond issue will provide one million dollars with which approximately 40 hospital beds will be added.

At this time, May 26, 1971, a class action was instituted to have the trust declared

invalid; and, alternatively, if the trust is maintained, that it be prohibited from issuing revenue bonds without an election by a majority of the taxpayers of the district. The trial court denied the relief claimed; an appeal was perfected to the Third Circuit; and that Court, because the validity of public trusts was a res nova question in our courts, certified the questions at issue to this Court for instructions. The record has been sent up, and we shall decide the whole matter in controversy in the same manner as if it were on appeal directly to this Court. La.Const. art. 7 § 25.

## I.

■ Pointing to Title 46, Section 1060, of the Revised Statutes, wherein it is provided that "Any hospital service district thus created and named by any police jury or any parish in the state shall constitute a body corporate in law with all the powers of a corporation . . . .," plaintiffs contend there is no basis for regarding hospital service districts as subdivisions of the State. They are, instead, plaintiffs insist, "a body corporate in law with all the powers of a corporation." And, the argument goes, since hospital service districts are not subdivisions of the State, they cannot be named as beneficiaries of public trusts as proposed, for the Public Trust Act (Act 135 of 1970, La.R.S. 9:2341–2347) limits beneficiaries of public trusts to "the state, or any parish, municipality, political or governmental sub-

division, or governmental agency or instrumentality of the state." La.R.S. 9:2341.

This contention is unfounded. A reading of Article XIV, Section 14(d–2), of the constitution, authorizing the legislature to create hospital service districts, discloses that the first sentence of the second paragraph answers this contention in these words: "Hospital service districts so created shall be considered sub-divisions of the State for all of the purposes of this Section 14 . . . ."

Moreover, the quoted language of Section 1060 of Title 46 of the Revised Statutes relied upon by plaintiffs to support their position is only a partial reference to the status of hospital districts. Section 1064 of Title 46 of the Revised Statutes, a different section of the same enabling act of which Section 1060 is a part, provides that hospital service districts "created under the provisions of this chapter are hereby declared to be political subdivisions of the state, and for the purpose of purchasing and acquiring lands . . . ." And, again, in the same section, hospital service districts "shall be sub-divisions of the State of Louisiana within the meaning of the laws of Louisiana relating to the voting and levy of special maintenance taxes incurring debt and issuing bonds . . . ."

It was upon this ample authority that the Police Jury of St. Landry Parish adopted its ordinance creating Hospital Service Dis-

trict No. 2 as "a public corporation and political subdivision of the State." The district is, therefore, a subdivision of the state within the contemplation of the constitution, the Public Trust Act and the police jury ordinance; as such, the district is capable of being designated as beneficiary of a public trust.

## II.

It is asserted by plaintiffs that Hospital Service District No. 2 cannot be a beneficiary of a public trust, for it cannot satisfy the requirements of Section 1801 of the Louisiana Trust Code (La.R.S. 9:1721–2252) requiring that the beneficiary of a trust "be a natural person, corporation, partnership, or other legal entity having capacity to receive property . . . ." Although we doubt the application of this Trust Code provision to public trust, since public trusts have public bodies as beneficiaries, instead of the class of beneficiaries named in Section 1801, we shall nevertheless answer the contention on the real issue presented, which is whether the district has the "capacity to receive property."

This contention is answered by the explicit language of Section 1060 of Title 46 of the Revised Statutes setting forth that:

. . . Such hospital service district shall have the right and power of expro-

priating property for the purpose of acquiring land for any purpose that it may find necessary in the operation of a hospital service district and may require (sic) by donation or purchase, any existing hospital facility in the district. It shall also have the power and authority to acquire any and all necessary equipment and buildings for the purpose of performing the objects for which it is formed, and shall own all sites and physical facilities which are acquired either by donation, purchase, expropriation, exchange and otherwise in full ownership.

In further defining the district's powers, Section 1064 of Title 46 contains the following:

The hospital service districts created under the provisions of this chapter are hereby declared to be political subdivisions of the state, and *for the purpose of purchasing and acquiring lands and purchasing, acquiring, constructing and maintaining hospitals, nurses, homes, physicians and dentists offices, laboratories, and other physical facilities necessary to carry out the purposes of this chapter.* Title to such land and physical facilities shall be in the public . . . . (Emphasis added.)

From the quoted language of these sections the hospital service district is a subdivision of the state "for the purpose of purchasing and acquiring" almost any property needful for carrying out its objectives.

This capacity combined with the stated objective of hospital districts which is "To own and operate hospitals" (La.R.S. 46:-1052) makes it clear that the hospital district has the "capacity to receive property" within the contemplation of Section 1801 of the Trust Code. Of course, in addition, the plain language of the Public Trust Act (La.R.S. 9:2341) declares that governmental subdivisions may be designated as beneficiaries of public trusts; no other authority would appear necessary to qualify them as such. (See Part I, supra.)

### III.

Plaintiffs maintain that the district court was in error in holding that the trustees could issue revenue bonds without the necessity of a referendum. In support of their position plaintiffs refer to Article XIV, Section 14(a), of the constitution, which, they argue, requires such a referendum. The pertinent part of that section of the constitution reads:

Municipal corporations, parishes and school, road, subroad, sewerage, drainage, subdrainage (waterworks and subwaterworks) districts, hereinafter referred to as subdivisions of the State, may incur debt and issue negotiable bonds, when authorized by a vote of a majority in number and amount of the property taxpayers qualified to vote under the Constitution and laws of this State, who vote at an election held for that purpose after notice published or posted for thirty (30) days in such manner as the Legislature may prescribe, and the governing authorities of such subdivisions shall impose and collect annually, in excess of all other taxes, a tax sufficient to pay the interest annually or semi-annually and the principal falling due each year, or such amount as may be required for any sinking fund necessary to retire said bonds at maturity; * * *

Plaintiffs profess that this provision of the constitution and Section 501 of Title 39 of the Revised Statutes are designed to regulate the issuance of revenue bonds of the type sought to be issued by the trust here. Following are the pertinent portions of Section 501 of Title 39:

Except as otherwise provided in special cases, no subdivision may incur any debt, issue any bonds, levy any special tax, or assume any indebtedness unless it has been authorized by vote of a majority in number and amount of the property taxpayers qualified to vote under the constitution and laws of this state who vote at an election hereunder * * *

By the terms of the Public Trust Act "The trustee, or trustees, under such an instrument shall be an agency of the state and the regularly constituted authority of the beneficiary . . . ." La.R.S. 9:-2344. As an "agency of the State" and "the regularly constituted authority of the beneficiary," which is a subdivision of the

State, plaintiffs assert the trust cannot issue revenue bonds without complying with the constitutional and statutory requirements of a public referendum.

These contentions are answered by saying that, in enumerating the governmental entities to which it refers as "subdivisions of the state," Article XIV, Section 14(a), does not refer to hospital service districts. Such being the case, hospital service districts are not controlled by its provisions. Furthermore, even if by some interpretation hospital service districts were deemed to be contemplated by that constitutional requirement of a referendum, we are certain that neither the constitutional requirement of a referendum nor the provisions of Section 501 of Title 39 of the Revised Statutes are applicable here because the hospital service district incurs no debt, issues no bonds and levies no tax in this plan. It is the trust which will incur the indebtedness securing the revenue bonds.

And, insofar as Section 501 of Title 39 is concerned, the Public Trust Act falls within the meaning of the phrase "Except as otherwise provided in special cases . . . . " Revenue bonds issued by such a trust would therefore constitute an exception to the requirements of Section 501 of Title 39, for the Public Trust Act declares the purpose of a public trust to be, among others, the "providing of funds for

the furtherance of any authorized or proper function of the beneficiary." No mention is made in this later enactment that the public trust shall be subject to the same restrictions imposed upon subdivisions of the State. To the contrary, it is a device created by the legislature to permit fund raising and operation of public facilities without those restrictions, otherwise no reason exists for the creation of public trusts.

It is apparent that public trusts are not within the contemplation of that provision of the constitution; nor are the revenue bonds, which the trust plans to issue, the type obligation to which the constitution has reference. The character of governmental unit and indebtedness contemplated by the constitution is a debt for which a governing authority of one of the subdivisions mentioned must impose and collect a tax sufficient to pay the interest and principal of the bonded indebtedness thus incurred. Neither the hospital service district nor the trust is mentioned in the constitution; moreover, the trust is neither capable of imposing a tax nor is a tax contemplated to discharge the indebtedness to be secured by the revenue bond issue.

Thus the character of the obligation the trust will incur under the expansion and renovation plan is not the type obligation the constitution seeks to subject to a referendum. In our view the constitution seeks to protect the taxpayers from indebt-

edness which must be discharged by their taxes without their consent in a prescribed referendum. Here no tax will be imposed on the taxpayer and the subdivision will incur no debt. Hence the constitution is not violated.

As the Public Trust Act prescribes, "No trustee or beneficiary shall be charged personally with any liability whatsoever by reason of any act or omission committed or suffered in the performance of such trust or in the operation of the trust property . . . ." La.R.S. 9:2344. Bonded indebtedness envisioned by the plan will never become an obligation of the hospital district—the beneficiary of the trust. The hospital and its present facilities are not being mortgaged to secure the payment of the bonds. Only the lease by the hospital district to the trustees is an obligation resting on the district. No part of the hospital facilities will be alienated. To the contrary, under the plan the hospital district will acquire additional facilities. Only the trustees' rights under the lease will be encumbered for the satisfaction of the bonded indebtedness, and the taxpayer is in fact relieved of the obligation of financing the renovation and expansion project.

 It is not contended, and the argument may not be successfully advanced, that the hospital district is without authority to grant a lease of its facilities. It is by virtue of a lease arrangement with the Sisters Marianites of the Holy Cross that the hospital has heretofore been operated, improved and expanded. It is the need for the lump sum to match Federal Hill-Burton grants and the need for more rapid expansion of facilities which make a lease to the trust necessary.

The power and authority to lease its facilities is clear from the legislation authorizing the creation of hospital districts. La.R.S. 46:1051–1068. In defining the powers and duties of the commission, the statute gives the commission the authority "To enter into lease agreements with recognized and duly constituted non-profit associations which are primarily engaged in the operation of hospitals." The district is given the broader authority to exercise "all the powers of a corporation;" and it shall have the power and right to "contract obligations" and "to do and perform any and all acts in its corporate capacity and its corporate name necessary and proper for the carrying out of the objects and purposes for which the hospital service district was created." And by the very wording of the Public Trust Act,

. . . The officers or any other governmental agencies or authorities having the custody, management or control of any property, real or personal or both, of the beneficiary of such trust, or of such a proposed trust, which property shall be needful for the execution of the trust purposes, hereby are authorized and

empowered to lease such property for such purposes, after the acceptance of the beneficial interest therein by the beneficiary as hereinafter provided, or conditioned upon such acceptance. (La. R.S. 9:2341).

As we have already noted, one of the stated purposes of the trust is "the providing of funds for the furtherance, of any authorized or proper function of the beneficiary." La.R.S. 9:2341. This renovation and expansion plan will provide facilities which are indispensable to accomplishing the objects and purposes for which the hospital district was created.

The plan is not therefore subject to the charge that the subdivision is doing indirectly what it cannot do directly, or that it is a scheme to circumvent the constitutional requirement of a referendum. This is so because, primarily, the subdivision (hospital district) is not incurring a debt or imposing a tax. It is leasing property to the trust as it is authorized to do in order that the trust may operate the hospital and raise funds to carry out an authorized function of the district.

Similar litigation in Board of County Commissioners of Oklahoma County v. Warram, 285 P.2d 1034 (Okl.1955), evoked the following statement from the Oklahoma Supreme Court: "The debts prohibited generally are those of a governmental subdivision of the State named in

the Constitution, and are chargeable to general governmental funds, for the payment of which resort may be made to taxation." Finding that the public trust device did not fall within these prohibitions the court approved the revenue bond issue proposed there.

In Morris v. City of Oklahoma City, 299 P.2d 131 (Okl.1956), like in the instant matter, the City Airport Trust was formed and the city leased its airports to the trust to permit a bond issue to be floated to obtain lump sum funds to improve air navigation facilities and obtain a lease of the facilities to the Federal Government. It was contended there that the trust was invalid because the city was leasing its airport to the trustees in violation of the constitutional prohibition that "No . . . city . . . shall be allowed to become indebted . . . to an amount exceeding, in any year, the income and revenue provided for such year, without the assent of three-fifths of the voters . . . ." Plaintiffs argued that the trustees were "Agents of the State" and since the indebtedness of the trustees was prohibited by the constitution, it was void and the public trust purporting to authorize such an indebtedness was unconstitutional.

Quoting from Board of County Commissioners of Oklahoma County v. Warram, supra, the Court declared:

. The trustee of trusts for the furtherance of public functions being by law

a state agency, indebtedness incurred by them and payable solely from the trust estate and its revenues, is not violative of Article X, Section 23 and 25 of the Constitution . . ..

This position was again, we believe correctly, affirmed in Meder v. City of Oklahoma, 350 P.2d 916 (Okl.1960).

If this public trust device so recently adopted by the legislature should unduly increase bonded indebtedness, as suggested, it will be time enough when this occurs for the legislature to abolish public trusts. In the meantime, however, the legislature may experiment with this device drawn within constitutional limitations. It is a latitude to which that policy making body is entitled in its search for means to meet the public need. Courts may not usurp this prerogative.

A safeguard against its improper use is built into this public trust concept of financing. It is the assurance that the revenue bonds must be satisfied entirely from the self-generated income of the trust estate—that is, from the operation of the lease; and the knowledge that no taxes may be imposed to satisfy the bonds. With these limitations, only facilities efficiently operated, producing adequate self-generated income to satisfy the debt incurred, will successfully market the bonds it issues.

Despite plaintiffs' dire predictions that this plan will bring chaos to the bond market, we have often observed that courts are not charged with the duty of passing upon the wisdom of legislation; the judicial function is to interpret and apply the law in light of the facts of each case. Abbott v. Parker, Treasurer, State of Louisiana, 259 La. 279, 249 So.2d 908 (1971); Arata v. Louisiana Stadium and Exposition District, 254 La. 579, 225 So.2d 362 (1969).

## IV.

In Louisiana the State Bond and Tax Board is constituted by legislative enactment (La.R.S. 47:1801–1808) to approve the incurring of debt, the levying of taxes or the issuance of bonds by certain subdivisions of the State. The entities which are affected and the circumstances under which this approval must be obtained are covered by this legislative enactment:

Hereafter, no parish, municipality, public board, political or public corporation, subdivision, or taxing district, and no road or subroad district, school district, sewerage district, drainage or subdrainage district, levee district, water-works or subwater-works district, irrigation district, road lighting district, harbor and terminal district, or any other political subdivision, taxing district, political or public corporation, created under or by the constitution and laws of the state shall have authority to borrow money, incur debt, or to issue bonds, or other evidences of debt, or to levy taxes, or

to pledge uncollected taxes or revenues for the payment thereof, where they are authorized by the constitution or laws of the state so to do, without the consent and approval of the board . . . . (La.R.S. 47:1803).

Plaintiffs contend that the Opelousas General Hospital Authority—the public trust—is in reality a quasi political subdivision of the State and it is, therefore, subject to the control of the State Bond and Tax Board by virtue of the quoted statute. From this assumption they conclude that public trusts cannot incur debt or issue revenue bonds without the prior approval of the State Bond and Tax Board.

This statute is express in its designation of the "political subdivisions" which are subject to its requirements. The public trust is not mentioned and by exclusion it is excepted from the operation of the statute. The reasons for excluding public trusts are evident. Public trusts are created by written instrument or by a will. When a written instrument is used these trusts must be subscribed by the grantor or grantors with the same formalities required for the creation of private trusts under the Louisiana Trust Code. La.R.S. 9:2341. Trusts are created by "persons" called settlors. La.R.S. 9:1761 "Persons," within the contemplation of the Trust Code, "means an individual, a corporation, a partnership, an association, a joint stock company, a business trust, or two or more persons having a joint or common interest." La.R.S. 9:1725 [3]. In the case at bar the trust was created by an individual by written instrument. Creating a trust by will would necessarily involve an individual as settlor.

As thus constituted the trust is not a "parish, municipality, public board, political or public corporation, subdivision, or taxing district, road or subroad district, school district, sewerage district, drainage or subdrainage district, levee district, water-works or subwater-works district, harbor or terminal district, or any other political or public corporation, created by the constitution or laws of the state . . . "

It is inappropriate, therefore, to assume, on the basis of conjecture, and without authority, that the public trust is a subdivision of the State as plaintiffs contend. The public trust has no taxing power or other sovereign authority which the State ordinarily invests in its subdivisions and public bodies.

This view that the legislature did not intend to subject public trust incurring debt to the approval of the State Bond and Tax Board is strengthened by the requirement that the public trust "shall be subject to the supervision of the Legislative Auditor of the State of Louisiana, to the same extent as the public body which is the beneficiary thereof." La.R.S. 9:2346. If approval by

the Board of revenue bond issues by public trusts was intended, it would have been easy enough to say so. Yet the legislature did not do this. It placed public trust under the supervision of the Legislative Auditor instead.

■ Since hospital service districts are not referred to in the legislation requiring approval of the State Bond and Tax Board, it may be said that these districts are not intended to be regulated by the Board. Despite the plausibility of this conclusion we adopt an alternative view under which we assume the district is covered by the act, but take the position that the district will not incur the debt or issue the bonds—conditions which must be satisfied before the authority of the Board can be invoked. Indisputably the trust will incur the debt, and trusts are clearly not included within the "subdivisions" intended to be regulated, for they are not named and they are not subdivisions of the State. The trust is required to undergo supervision by the Legislative Auditor, nothing more.

### Conclusion

The plan we approve here is no effort to circumvent the referendum requirement of the constitution. It is an alternative to the plan requiring a referendum to approve the issuance of tax-supported bonds. It is an alternative the law recognizes and approves.

It is held, therefore, that the public trust designated as Opelousas General Hospital Authority is valid and may issue revenue bonds without an election by a majority of the taxpayers of the district, said bonds to be secured by the self-generated revenue of the lease proposed between Hospital Service District No. 2, as lessor, and the public trust designated as Opelousas General Hospital Authority, as lessee.

For the reasons assigned, the judgment of the trial court is affirmed.

McCALEB, C. J., dissents subscribing to the views expressed by DIXON, J.

BARHAM, J., dissents for the reasons assigned by DIXON, J.

DIXON, Justice (dissenting).

I must respectfully dissent.

This action was characterized by the lawyers involved as a "test case." With commendable frankness, it was stated in argument before us that the plaintiffs hoped they would lose. So far, their wishes have come true. On appeal to the Court of Appeal, certain questions were certified to this court. We may answer the questions, or take the whole case and decide it, under the authority of Constitution Article 7, § 25.

The principal objection and difficulty to the litigation at hand is that it lacks the qualities imparted by partisanship. The Anglo-Saxon legal system contemplates advocates on each side of the case who seek to advance the best interest of their

clients. Thus courts can have some confidence that they have explored the applicable jurisprudence and theories on each side.

What is presented to us for our approval is a financing scheme for a hospital service district. In November, 1970 a $1,600,000 bond issue proposed by the hospital service district was defeated, according to the testimony, by a ten to one margin. Now the hospital service district continues in its efforts to issue revenue bonds, to be financed by revenues generated from the operation of the hospital. Although the method adopted involved the use of a "public trust" (R.S. 9:2341–2347), almost any other legal entity might have served the purposes of the hospital service district. Under the public trust act, a "trust indenture" was executed. The so-called "trustor," Pat F. Willis, recited that he paid the "trustees" $100.00, for which the "trustees" agreed to hold and manage, etc. property which might from time to time be transferred "unto this Trust or the Trustees hereof." Hospital Service District No. 2 is made the "beneficiary." The trustees are the same persons who are the chairman and board members of Hospital Service District No. 2.

The scheme further contemplates that Hospital Service District No. 2 should "lease" its facilities to the trust. The contemplated lease is not before us. After the hospital district has leased itself to the trust, the trust proposes to issue bonds and pledge the hospital revenues, mortgage the "leasehold interest" and mortgage any new facilities that may be added to the hospital as a result of the bond issue.[1]

The record before us consists of: the petition, which contains allegations of certain infirmities suggested by the plaintiffs; the "trust indenture;" the answer; a stipulation of fact; about fifty pages of "testimony." The testimony included that of an architect, the chairman of Hospital Service District No. 2, a member of the Board of Hospital Service District No. 2, and an economist. The economist explained the financing scheme at length.

There are several relevant constitutional and statutory provisions that affect a scheme for public financing like the one before us.

Article 14, § 14(d–2) of the Constitution provides that the legislature may authorize police juries to create hospital districts, and

---

1. The testimony of the witness who explained the scheme was:
"A. The bonds will be secured by the revenues generated by the operation of the hospital, the existing facilities plus the facilities to be added under the expansion project, and, in addition, the bond holders will be given the added pledge of a mortgage on the leasehold on the existing facilities for the life of the outstanding bonds, and they will be given a mortgage on the new facilities that will be added under the financial plan involving the use of the Public Trust for purposes of issuing the proposed bonds."

"by general law and within the limitations and conditions contained in this Section 14, authorize hospital service districts so created, through such governing authority as may be provided therefor by the Legislature, to incur debt and issue negotiable bonds for the purpose . . . ." Further, the section provides:

"Hospital service districts so created shall be considered sub-divisions of the State for all of the purposes of this Section 14 and the provisions of this Section which pertain to the authorization, issuance and payment of bonds by sub-divisions of the State shall be applicable in all respects to the authorization, issuance and payment of the bonds by hospital service districts so created."

Article 14, § 14(a) allows subdivisions to incur debt and issue bonds after an election, and requires the governing authority to impose and collect taxes necessary to service and retire the bonds.

We recently held in Liter v. City of Baton Rouge, 258 La. 175, 245 So.2d 398, that Article 14, § 14(a) required the consent of the electorate before the City of Baton Rouge could issue revenue bonds. We struck down a bond resolution of the city and parish of East Baton Rouge which was to have been funded by revenues from a sales tax ordinance, the validity of which we sustained.

If Hospital Service District No. 2 were proposing to issue bonds, it could not, under

the very constitutional provisions which allow the creation of the district, issue the bonds without an election.

The majority holds that this financing plan is not subject to the charge that the subdivision is doing indirectly what it cannot do directly, and is not a scheme to circumvent the requirement of an election. This is so, says the majority, because the subdivision "is not incurring a debt or imposing a tax."

The financing scheme proposed here is not even transparent. It is bold, almost to the point of being flagrant. The ultimate object of the commissioners is commendable. They want to do something for the public which will benefit the public. Nevertheless, to add on to the facilities of the hospital, after having been defeated in a bond proposal election, the commissioners merely convert themselves into "trustees," lease the property of their charge to the "trust," and proceed to issue revenue bonds without an election. It may be true that this is not indirection; if not, it is certainly not conformity. It is studious avoidance of the provisions of the Constitution and statutes by the mere device of changing the names of the offices held by the commissioners of Hospital Service District No. 2. Whatever the courts of Oklahoma have done in cases like this, the courts of Louisiana have not yet begun to allow the circumvention of constitutional provisions with such ease.

R.S. 9:2344 makes the trustees under a public trust "an agency of the state." They are also fiduciaries for the Hospital Service District No. 2. They are not merely agents of the hospital district—they constitute the board of commissioners of the hospital district. Can these same people who are prohibited from issuing bonds without an election as commissioners of the hospital district dispense with the election because they call themselves trustees? When they act as trustees, they act as an agency of the State of Louisiana. Whatever they call themselves, they, and only they, are the people through whom the Hospital Service District No. 2 is able to act.

Whatever the confusion created concerning the offices they hold, the board of commissioners and the trustees are the same, and are prohibited by the Constitution and the statutes from issuing bonds without an election.

Statutory provisions for hospital service districts are at R.S. 46:1051 et seq. 46:1064 specifically makes hospital districts subject to R.S. 39:501 et seq. That section prohibits any subdivision from incurring *any* debt or issuing *any* bonds without an election.

R.S. 46:1064 also provides:

"Title to such land and physical facilities shall be in the public. Such districts shall be subdivisions of the State of

Louisiana within the meaning of the laws of Louisiana relating to . . . issuing bonds . . ."

Apparently the "trustees" plan to avoid seeking the approval of the State Bond and Tax Board for the bond issue they propose. The plaintiffs allege that such bonds are subject to the approval of the State Bond and Tax Board, and the defendants deny the allegation.

R.S. 47:1803 prohibits subdivisions, public corporations or any other taxing district from borrowing money or issuing bonds or pledging revenues for their payment without the consent and approval of the State Bond and Tax Board. Any bond issued without its consent is void.

Among the infirmities afflicting this financing scheme is the arrangement euphemistically called a "lease" of the facilities from the hospital district to the trust. The plan is for the trust to hypothecate the "leasehold interest" (along with newly constructed facilities) to secure the bonds. This "lease" does not appear in the record, but its nature is suspect. We know that it is not the kind of arrangement contemplated by the statutes governing hospital districts (R.S. 46:1055(9)). The Marianite Sisters operated the hospital under a lease arrangement for several years. The new plan is for the trust to continue the lease with the Sisters for the operation of the hospital.

If the "lease" from the hospital service district to the trust were a legitimate lease, the consideration would necessarily be based upon the prospective revenues. One of the board members testified that the revenues from the hospital were such that "we can't . . . do anything else but live from day to day." We know, however, that the trust plans to use the revenues to service the bonds and retire them. The corpus of the trust is only $100.00, and, as far as the record discloses, will remain at that figure until the hospital service district "leases" itself to the trust. When it acquires the "lease," the trust proposes to issue bonds secured by the "leasehold estate" and the new construction to be built with borrowed money and matching federal funds.

What we can learn and infer from the record about the "lease" indicates that it is more nearly a loan for use (C.C. 2893 et seq.) than a lease. A lease is "a contract by which one of the parties binds himself to grant to the other the enjoyment of a thing during a certain time, for a certain stipulated price which the other binds himself to pay him." C.C. 2674. The real reason for the transfer is to enable the trust to issue bonds. The hospital service district has the power to issue bonds, but only within the limitations established by the Constitution and statutes governing "subdivisions" and taxing districts.

Article 4, § 12 of the Constitution prohibits the loan, pledge or grant of the property of any political corporation of the State to or for any person or corporation, public or private.

The admitted purpose of the creation of this "public trust" is to obtain additional financing for the expansion of the hospital facilities. In other words, the object of the trust is to issue bonds and avoid the constitional requirement of an election and the statutory requirement of submission of the proposition to the State Bond and Tax Board. Only the most extreme "interpretation" of the powers of the hospital commissioners could prevent such an object from being "ultra vires."

Since this financing plan proposed by the commissioners of the Hospital Service District No. 2 is so clearly violative of the provisions of our Constitution and statutes, the judgment of the district court should be reversed, and judgment should be rendered in favor of the plaintiffs.