Dear Mr. Futch:
You requested the opinion of this office concerning a proposal received by the Board of Trustees for State Colleges and Universities (the "Board of Trustees") from a company which proposes to renovate a dormitory on the campus of a state university. The proposal you furnished this office may be summarized as follows:
 1. A non-profit corporation (the "Issuer") would be formed which would rehabilitate a dormitory and issue certificates of participation or tax exempt bonds "on behalf of the University" (the "Bonds") to cover the costs of rehabilitation. Neither the University nor the Board of Trustees would issue the Bonds.
 2. The University would lease the dormitory to the Issuer for up to 99 years with annual payments of $1.00 and sublease the dormitory back from the Issuer.
 3. The Bonds would be payable solely from the rents and other revenues from the dormitory which would be mortgaged to secure the Bonds.
 4. The Issuer would indemnify the University and name the University on its liability policy.
 5. The University will operate the dormitory while the Bonds are outstanding.
 6. In thirty years, when the Bonds mature, or when the Bonds are fully paid, the dormitory plus any remaining monies held in escrow by the Trustee Bank pertaining to the dormitory would revert to the University and the University would be free to dispose of the dormitory or adapt it to any other university purpose.
 7. The University will make semi-annual lease payments in an amount sufficient to amortize the debt service on the Bonds and shall pay maintenance expenses as required, including a reserve fund if required by the Bond purchaser. Lease payments shall include amounts to amortize the debt and maintain any reserves required under the terms of the Bond issue.
Your request is rather broadly phrased and did not include specific questions. It is possible that the response to your request does not address all the legal issues relative to the proposed transaction and further that the answer to your request may be different depending upon the structure of the actual transaction.
The authority of the Board of Trustees to lease the ground to the Issuer is set forth in La. R.S. 17:3361(A) which provides in pertinent part as follows:
 "A. Each board may grant leases of any portion of portions of the grounds or campus of any college or university or of other immovable property under its supervision and management, for a term not to exceed ninety-nine years for each lease, to any of the following:
* * *
 (5) A private entity, provided such private entity shall be obligated under the terms of the lease agreement to construct improvements on the leased premises which will further the educational, scientific, research or public service functions of the board.
 B. Each board may permit the lessees to erect, construct, and maintain thereon fraternity or sorority houses or homes, student centers, facilities for religious worship and instruction, armories, storehouses, and other structures. Contracts entered into by a private lessee for the performance of work on the leased premises for the erection, construction, or maintenance of improvements on the leased premises shall not constitute public works contracts.
* * *
 D. The architectural plans for each house or other structure shall be approved by the board prior to construction on the leased grounds.
 E. The provisions of R.S. 39:1643 and Part I of Title 41 of the Louisiana Revised Statutes of 1950 shall not be applicable to agreements authorized by this Part. (Emphasis supplied)
Thus the Board of Trustees could legally lease any portion of the grounds of a campus or other immovable property under the supervision and management of the Board of Trustees to the Issuer if the terms of the lease require the Issuer to construct improvements on the leased premises which will further the educational, scientific, research or public service functions of the Board of Trustees. Dormitories are, by their very nature, immovable property. See La. C.C. art. 461, et seq. There can also be no question that dormitories located on the campus of a university further the "educational, scientific, research or public service functions" of the Board of Trustees. The proposal indicates that the Issuer will remove and rebuild walls, replace ceilings, add closets and sidewalks, wire for telephone and cable television, add a sprinkler system, install a computer and rebuild the bathrooms. It would appear that this would constitute substantial rehabilitation and be in the nature of constructing improvements to the dormitory as opposed to mere maintenance to the dormitory, which is not an authorized purpose for a lease under R.S. 17:3361(A)(5). [See also, the definition of "construction" as found in La. R.S. 17:2196.2 pertaining to the authority of university governing boards to borrow money for construction costs of academic facilities for institutions of higher education, which definition includes "rehabilitation,alteration, conversion or improvement . . . of existingstructures. (Emphasis supplied.)] Of course, the Board of Trustees would have to approve the architectural plans for the construction as provided in R.S. 17:3361(D).
As to the leaseback from the Issuer to the University, La. R.S. 17:3365 provides in pertinent part:
 "A. With the prior written consent and approval of the board, all or any portion of the property or the improvements constructed thereon may be assigned or subleased under such terms and conditions as authorized by the board. The board may lease back all or any portion of the property or the improvements constructed thereon under such terms and conditions as authorized by the board. The term of any assignment, sublease or leaseback may equal but not exceed the term of the original lease." (Emphasis supplied).
It should be noted that La. R.S. 17:3362 and 3364 authorize the Board of Trustees to place certain conditions in the lease. The violation of those conditions could cause the lease to be canceled, which may affect the marketability of any debt to finance the cost of rehabilitating the dormitory.
Of course the formation of the non-profit corporation cannot violate La. R.S. 12:202.1(A) which provides in pertinent part as follows:
 "Notwithstanding any other provisions of this Chapter or of any other law, no state board, commission, or department, nor any other persons, acting on behalf of such state board, commission, or department, shall incorporate or cause to be incorporated any nonprofit corporation which has for its purpose any public or quasi-public function or any function for the benefit of or in connection with any public agency, purpose or function, if in the exercise of any part of the functions of the corporation any bonds or other evidences of indebtedness of the corporation are or may be issued, unless the purpose for which the corporation is to be created; the amount of bonds to be issued; the method of financing said bonds, including but not restricted to the term of the bonds, the interest and other charges to be paid with respect to the bonds, and the purposes for which the bonds are to be issued shall have been first submitted to and approved by the legislature." (Emphasis supplied)
The next issue is whether the rent of $1.00 from the Issuer to the university violates Article VII, Section 14(A) of the Louisiana Constitution which prohibits the funds, credit, property, or things of value of the state or of any political subdivision from being loaned, pledged, or donated to or for any person, public or private.
In City of New Orleans v. Disabled AmericanVeterans, 223 La. 363, 65 So.2d 796 (1953), the City leased property to the Disabled American Veterans for 35 years for $1 per year and the agreement of the lessees to keep the buildings insured, to maintain the buildings and assume tort liability. The Supreme Court found that the lease was not a donation and that there was serious consideration for the lease. In Jurisichv. Hopson Marine Service Co., 619 So.2d 1111 (La.App. 4th Cir. 1993), the defendant in a suit for wrongful injury to oyster beds alleged that certain oyster leases were a donation of state property in violation of Art. VII, § 14 because the $1 or $2 per acre, per year rental was so low. The court citingArnold v. La. Stadium Exposition District, 254 La. 579,225 So.2d 362 (1969), found that even if rental payments are nominal, other obligations imposed by the lease may supply the requisite consideration. In Jurisich, the other obligations were imposed by statute and were serious consideration. In Arnold v. Board of LeveeCommissioners, supra, the court found that there was serious consideration and not a violation of Article VII, Section 14, for a lease of Orleans Levee District property to the F. Edward Hebert Foundation. The lease was for $1 per year, the Foundation had to construct a building at a minimum cost of $300,000, which was to eventually become Levee District property with no compensation due the Foundation. The Foundation also had to maintain the improvements during the lease and to pay insurance premiums.
A case to the contrary, however, is NortheastLouisiana Detachment of Marine Corps League v. City ofMonroe, 253 So.2d 107 (La.App. 2d Cir. 1971), wherein the court held a 99 year lease for $1 per year invalid under Article VII, Section 14. In this case, the lessee was obligated to construct a building on the property and the lessee assumed all liability for claims arising out of its use of the building. The court noted that the lessee had no obligation to perform any civic duties nor to make the premises available for public use. The court distinguished City of New Orleans v. DisabledAmerican Veterans, supra, because in the New Orleans case "the agreement of the lessee in regard to existing buildings owned by the City was of obvious economic and practical advantage and benefit to the City." But in the Monroe situation, there was no advantage or benefit to the city or the public arising from the lessee's agreements relating to a building to be constructed for the lessee's own use on land owned by the city.
In the proposed transaction, it is contemplated that the Board of Trustees would lease the dormitory for $1.00 per year to the Issuer and then lease it back for the amount necessary to pay the debt service on the Bonds plus paying the maintenance expense as required, including the creation and maintenance of a reserve fund, if required. In two of the three cases cited above which approved a lease of public property for $1 per year, the court found significant that the lessee would have the obligation to maintain the property, unlike the proposed situation where the university would have the obligation to maintain the property. It is very possible that the $1 per year consideration would be found to violate Article VII, Section 14.
The next issue pertains to that part of the proposal which states that the dormitory would be mortgaged to secure the revenue bonds. The mortgage would occur while leased to the Issuer.
La. R.S. 17:3365(B) states "[L]essees may grant mortgages on the improvements erected on the leased premises and on the lease, but all such mortgages, as well as the rights of the mortgagees, shall be subject to the rules and regulations and to all the provisions of this Part." Thus a mortgage is permissible under the statute, provided that it is made subject to the rules and regulations of the Board and to all the provisions of La. R.S. 17:3361, et seq.
Another question that arises is whether the mortgage on public property would violate Article VII, Section 14(A). The exception to the prohibition in Section 14(A) is located in Section 14(B) which allows "the pledge of public funds, credit, property, or things of value for public purposes with respect to the issuance of bonds or other evidences of indebtedness to meet public obligations as provided by law". In Dept. of Culture,Recreation and Tourism v. Fort Macomb DevelopmentCorporation, 385 So.2d 1233 (La.App. 4th Cir. 1980), pursuant to special legislation, the Dept. of Culture, Recreation and Tourism ("CRT") leased a historical site to a company which mortgaged the lease. CRT appeared in the mortgage to subordinate its leasehold interest to that of the mortgagee. The company later quit paying the rent and CRT sued to evict the company, cancel the lease and the mortgage of the lease. CRT attempted to argue that the mortgage of the lease violated the constitution. The court found that the state had not loaned, pledged or granted anything and thus there was no constitutional violation.
Another question is who would have to approve the transaction? As alluded to above, the Board of Trustees would have to approve the agreement (La. R.S. 17:3361). The Board of Trustees could waive certain rules relative to the erection, construction and maintenance of the structure (La. R.S. 17:3362) and could also waive certain rules relative to the conduct and social activities of people in the structures to be constructed pursuant to La. R.S. 17:3361 (La. R.S. 17:3364).
In addition to the Board of Trustees approval, it is necessary to obtain the approval of the Board of Regents. La. R.S. 17:3129. From the limited facts given to this office, we are unable to determine whether the project would be subject to the capital outlay process. Of course, the approvals which must be obtained for any construction project, i.e. State Fire Marshal's Office and possibly the Department of Environmental Quality, must likewise be obtained for this project.
State Bond Commission approval is required for the issuance of bonds or other obligations of the state or any state board, agency, or commission, or by any political subdivision of the state. Article VII, Section 8(B), La. Const. of 1974. From our understanding of the proposal, it does not appear that the Bonds will be issued by the state or any state board, agency or commission. Rather, it will be the private debt of the Issuer, a non-profit corporation.
La. R.S. 39:1410.31 also requires State Bond Commission approval of any agreement, including, but not limited to agreements of lease, lease-purchase or third party financing, entered into by, on behalf of or with the state, directly or through any state board, department, commission, authority or agency, providing for the outlay of funds in excess of one hundred thousand dollars, in any fiscal year, for capital improvement or expenditure, including, but not limited to, equipment, buildings, land, machinery, renovations, major repairs and construction. Any agreement made in violation of this section is null and void. The exceptions to the requirement of State Bond Commission approval are set forth in paragraph C and include "capital outlay projects approved by the legislature pursuant to Article 7, Section 11(B) of the Louisiana Constitution of 1974, or to the expenditure of funds previously appropriated by the legislature, or to any multi-year agreement dealing which movable property containing an appropriation dependency clause which provides for no penalty upon termination or failure to fund." We have been supplied with no facts to determine whether or not State Bond Commission approval would be necessary under the provisions of La. R.S. 39:1410.31. La. R.S. 39:1405(B) does provide in pertinent part as follows:
 "No person or entity, public or private, shall incur debt or issue evidences of indebtedness for the purpose of financing any project in the state of Louisiana, the interest upon which indebtedness or evidence thereof is exempt from federal income taxation under Section 103 of the Internal Revenue Code of 1954, without the consent and approval of the State Bond Commission. Any evidence of indebtedness incurred or issued in violation of this Section shall be null and void and no court of this state shall have jurisdiction to enforce the payment thereof pursuant to the provisions of R.S. 47:1806." (Emphasis supplied)
State Bond Commission approval is required by La. R.S.17:3366 in order for a university to give a loan guaranty. That provision is inapplicable to the facts herein and furthermore is subject to constitutional challenge. See Op.Atty.Gen. 89-72.
Because the proposal states that the only security for the Bonds would be the rentals and other revenues from the dormitories and the Issuer is not a state entity, it does not appear that the Bonds would be considered "net state tax supported debt" as defined in La. R.S. 39:1367(E)(2)(a) or under the Debt Limit Rule of the State Bond Commission. See also, Op.Atty.Gen. 94-452. It is assumed for purposes of this opinion that the term "rentals and other revenues from the dormitories" refers to the rentals received from the university students and not the obligation of the university under the leaseback. If the latter is what is meant by the phrase "rentals and other revenues from the dormitories", and the university would be obligated to pay monies from other sources than the actual rental of units by university students, it is very possible that the Bonds would be considered "net state tax supported debt" under the State Bond Commission Debt Limit Rule.
This opinion has been premised on certain assumptions, including that the debt involved would be structured so that it could never be considered full faith and credit debt of the state, the Board of Trustees or the university. Such full faith and credit debt can only be issued in accordance with Article VII, Section 6(A) and (B) after compliance with Article VII, Section 11(C) of the Louisiana Constitution.
This opinion is limited to Louisiana state law issues only, and no opinion is given as to whether the Bonds described in the proposal would be subject to federal income taxation. Nor does this opinion address whether the bonds would be exempt from taxation under Louisiana law.
The undersigned does not have any knowledge as to whether the dormitory is part of a university system nor if the university in question has outstanding housing system revenue bonds. The undersigned was specifically requested not to address any issues relative to outstanding bonds of the university, and no such opinion is given hereby.
Furthermore, no opinion is given as to the adequacy or lack thereof of the resolution which was part of the proposal supplied this office. Nor does this opinion address any issues which arise out of the statement that "[A] computer system shall be provided for every four (4) students" followed by a 14 item description of the computer system, which description includes brand names.
As noted earlier, the request was vague and it is very possible that there are additional legal issues which are not addressed in this opinion.
If the Board of Trustees decides to pursue this type of transaction, it is strongly suggested that the Board retain competent professionals to represent the interests of the Board and the university to ensure that the costs associated with this type of financing would justify using this rather than alternative means of financing the improvements to the dormitory.
Trusting this adequately responds to your request,
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: _____________________ MARTHA S. HESS Assistant Attorney General